**Marvin Roger HESS and Leona Hess, Ronald and Dianne Mace, Roy and Cindy Maurer, The Shoop Family Trust c/o Edwin and Denny Shoop, and Gary and Dorene Lahr, Petitioners**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 18, 2014.

Decided Dec. 22, 2014.

Scott T. Wyland, Harrisburg, for petitioners.

Krystle J. Sacavage, Assistant Counsel, Harrisburg, for respondent.

David B. MacGregor, Philadelphia, for intervenor PPL Electric Utilities.

BEFORE: DAN PELLEGRINI, President Judge, and BERNARD L. McGINLEY, Judge, and RENÉE COHN JUBELIRER, Judge, and ROBERT SIMPSON, Judge, and MARY HANNAH LEAVITT, Judge, and PATRICIA A. McCULLOUGH, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge McGINLEY.

Marvin Roger Hess and Leona Hess, Ronald and Dianne Mace, Roy and Cindy Maurer, The Shoop Family Trust c/o Edwin and Denny Shoop, and Gary and Dorene Lahr (Protestants) Petition for Review of the Order of the Pennsylvania Public Utility Commission (Commission) which approved the Applications of PPL Electric Utilities Corporation (PPL)[1], to exercise the power of eminent domain to acquire rights-of-way and easements over certain lands of Protestants for construction of a new eleven-mile transmission line and substation.

PPL is a public utility and an electric distribution company as defined in Sections 102 and 2803 of the Public Utility Code (Code), 66 Pa.C.S. §§ 102, 2803.

PPL is also a "public utility corporation" as defined in Section 1103 of the Business Corporation Law of 1988 (BCL), 15 Pa. C.S. § 1103. PPL furnishes electric distribution, transmission, and supplier of last resort services in a service area covering all or part of twenty-nine counties in eastern and central Pennsylvania.

### Relevant Statutory Law

PPL is statutorily obligated to provide "safe and reliable" service to its customers. Section 1501 of the Code provides, in relevant part, as follows:

> Every public utility shall furnish and maintain adequate, efficient, safe and reasonable service and facilities and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public. Such service also shall be reasonably continuous and without unreasonable interruptions or delay.

66 Pa.C.S. § 1501.

To meet this obligation, the BCL authorizes public utility corporations, like PPL, to:

> (a) ... *take, occupy and condemn property* for one or more of the following principal purposes and ancillary purposes reasonably *necessary or appropriate* for the accomplishment of the principal purposes:
>
> * * * *
>
> (3) The production, generation, manufacture, transmission, storage, distribution, or furnishing of ... electricity....

15 Pa.C.S. § 1511(a)(3). (Emphasis added.)

---

1. PPL has intervened in this appeal in support of the Commission's order.

Before PPL may exercise its power of eminent domain, it must first seek and obtain a certificate of public convenience for approval from the Commission. The BCL provides the Commission with the power to. authorize the condemnation of property as necessary for construction of the transmission line if the Commission determines that the service to be furnished by the utility is "necessary or proper for the service, accommodation, convenience, or safety of its patrons, employees and the public:"

> (c) **Public Utility Commission Approval.**—The powers conferred by subsection (a) may be exercised to condemn property outside the limits of any street, highway, water or other public way or place for the purpose of erecting poles or running wires or other aerial electric, intrastate aerial telephone or intrastate aerial telegraph facilities only after the Pennsylvania Public Utility Commission, upon application of the public utility corporation, has found and determined, after notice and opportunity for hearing, that *the service to be furnished by the corporation through the exercise of those powers is necessary or proper for the service, accommodation, convenience or safety of the public* . . . .

15 Pa.C.S. § 1511(c). (Emphasis added.)

Here, PPL seeks to condemn certain portions of properties owned by Protestants to construct a new 11.54 mile long 69 kilovolt (kV) transmission[2] tie line known as the Richfield–Dalmatia 69 kV Tie Line (hereinafter "New Transmission Tie Line") and a new Meiserville 69 12 kV Substation[3] (hereinafter "New Substation").

### PPL's Applications Pursuant to 15 Pa.C.S. § 1511(c)

In October 2011, PPL filed ten Applications with the Commission pursuant to 15 Pa.C.S. § 1511(c) seeking approval to condemn portions of Protestants' properties to accommodate the New Transmission Tie Line and New Substation.[4]

In its Application, PPL stated that the purpose of the New Transmission Tie Line and New Substation is "to resolve violations of reliability standards set forth in PPL Electric's Reliability Principles & Practices Manual (RP & P Guidelines) applicable to 69 kV transmission lines and 12 kV distribution lines." Application of PPL Electric Utilities Corporation (Application), October 11, 2011, ¶ 10 at 4; Reproduced Record (R.R.) at 18a. The New Transmission Tie Line will connect the existing Juniata–Richfield 69 kV line with the existing Sunbury–Dauphin 69 kV line. According to PPL's "Necessity Statement," the project, which will cross Protestants' properties, is required to "improve reliability in both PPL's transmission and distribution systems to adhere to PPL's RP & P [Guidelines]." Necessity Statement attached to Application as Exhibit No. 1, at 4; R.R. at 58a.

With regard to meeting transmission standards, PPL averred that in the event

---

2. PPL's transmission system is divided into bulk (or high voltage) and non-bulk systems, with transmission lines operating at or above 100 kV constituting the bulk electric system (BES), and the transmission lines operating below that level are non-bulk systems (non-BES).

3. A substation is where voltage levels are sequentially stepped down for ultimate delivery into the distribution system.

4. PPL required rights-of-way and easements from a total of fifty-four landowners. PPL obtained appropriate rights of way and easements from forty-three landowners. Protestants' properties were the only remaining properties over which rights-of-way were needed.

of an outage on the existing Juniata–Richfield 69 kV transmission line, approximately forty-four megawatts (MW) of load would remain interrupted until repairs were completed or additional reinforcements were provided. This would be a violation of the RP & P Guidelines.[5] An outage on the Sunbury–Dauphin 69 kV transmission line would cause approximately ten MW of load to remain interrupted until repairs were made and field switching is completed. Although this particular situation on the Sunbury–Dauphin line is not a violation of PPL's RP & P Guidelines, an outage encountered under 2012 peak conditions on the Sunbury–Dauphin 69 kV line due to a line failure would result in approximately thirty-three MW of load to remain interrupted after all field switches are complete. This is a violation of the RP & P Guidelines. The proposed project will resolve these load restoration issues with the Sunbury–Dauphin line.

PPL stated that the proposed New Transmission Tie Line will provide for quick restoration of electric service by providing additional transmission capacity and load transfer capability for loss of either the Juniata–Richfield 69 kV line or the Sunbury–Dauphin 69 kV line. It will reduce the duration of any outage by improving PPL's ability to transfer load from one transmission line to another in the event of an outage on either the Juniata–Richfield 69 kV line or the Sunbury–Dauphin 69 kV line.

With regard to meeting standards at the distribution level, PPL indicated that the existing "Dalmatia 36–02" 12 kV distribution line which services a substantial area violated "several guidelines of PPL Electric's RP & P [Guidelines], and it has been among the worst performing lines on PPL Electric's system." Application ¶ 19, at 6; R.R. at 20a. PPL's RP & P Guidelines provide that "no more than 1,300 customers should be served from a 12 kV circuit, and that a 12 kV circuit should not supply more than 50 circuit miles of distribution lines." Application ¶ 20, at 6; R.R. at 20a. "The Dalmatia 36–02 12 kV distribution line currently exceeds PPL Electric's RP & P guidelines. The 12 kV line currently serves more than 2,200 customers and supplies 194 circuit miles of distribution lines." Application ¶ 20, at 6; R.R. at 20a.

PPL explained that the New Substation will enable PPL to split the "Dalmatia 36–02" 12 kV distribution line by adding two new 12 kV distribution lines. This reinforcement will reduce the customer count per feeder and circuit miles of the existing "Dalmatia 36–02" 12 kV distribution line. The objective being to reduce the number of customers affected during any outage.

PPL provided an in-depth analysis of three proposed routes for the new line and substation and concluded that the route over portions of Protestants' properties was the best route.

PPL further averred that it considered various functional alternatives to resolve the violations of its RP & P Guidelines. After extensive analysis, PPL concluded that the preferred configuration was to construct the New Transmission Tie Line and New Substation. The project will improve the integrity of the system and resolve all of the RP & P Guideline 69 kV transmission violations by providing additional transmission capacity and load transfer capability. Application ¶¶ 24–25,

5. Under PPL's RP & P Guidelines, 60 MW of load may be interrupted for up to two hours, after two hours thirty MW of load must be restored by field switches to adjacent transmission lines, and after the earlier of ten hours or repairs are completed, all load must be restored. Statement of Necessity attached to Application as Exhibit No. 1 at 5; R.R. at 59a.

at 6–7; R.R. at 20a–21a. The New Substation will resolve the RP & P distribution system guideline violations for customer count per feeder and circuit line miles. The estimated cost of the project is $12 million.

Protestants and others filed preliminary objections to PPL's application for eminent domain approval because PPL did not establish that the project was "necessary" or that there was a "need" for it.

Two Administrative Law Judges were assigned to conduct hearings between March 2012, and September 2012. In March 2012, nineteen citizens, including Protestants, gave public comment. Many stated that outages and reliability are not a concern in the area. The consensus among the objectors was that there is no legitimate need for the project and that PPL based its evaluation of need on uncorroborated data and its own RP & P Guidelines and internal quality standards. Public Input Hearing Transcript, March 7, 2012, at 50–74; R.R. at 282a–298a.

The parties also submitted written direct, rebuttal, and rejoinder testimony.

Gopi Kedia (Kedia), a Principal Engineer for PPL, explained that PPL's RP & P Guidelines were developed "to ensure adequate and appropriate levels of electric service consistent with good utility practice. Specifically, the process assures that PPL Electric's transmission and distribution systems can supply all customer load in a way that is reliable and economical." Direct Testimony of Gopi R. Kedia, at 4; R.R. at 34a.

Kedia explained that PPL's transmission systems are planned so that they meet the following guidelines:

1. Normal operation of the system will not load any electric facility beyond its normal continuous rating.

2. In the case of an outage on a single circuit 69 kV transmission line, 60 MW of load can be interrupted for up to 2 hours. After 2 hours, 30 MW of load must be restored by field switching to adjacent transmission lines. After 10 hours, all load must be restored.

3. Large scale, long-term or frequent interruptions and excessive load loss are to be avoided due to the adverse and potentially hazardous effect they have on the public.

Direct Testimony of Gopi R. Kedia, at 5; R.R. at 35a.

Protestants presented the expert testimony of Edward G. McGavran (McGavran), an electrical engineering consultant. McGavran opined that the project proposed by PPL is "not necessary to remedy the reliability concerns noted by PPL." Direct Testimony of Edward G. McGavran, at 10; R.R. at 163a. He believed that "rather than constructing an entirely new line, it is more prudent to upgrade the existing [Sunbury–Middleburg 69 kV] transmission lines by either installing heavier conductors with more capacity than the existing conductor, or adding a new circuit with more capacity on each line." *Id.* McGavran believed the system could meet the demands under any condition if PPL used the existing right-of-way and converted the single-circuit lines to double circuit lines with a heavier conductor. *Id.* He opined that conversion of the existing circuit would cost less than construction of a completely new circuit and minimize environmental impacts. *Id.* at 11; R.R. at 164a. McGavran also opined that the construction of the New Transmission Tie Line and New Substation are unnecessary because the existing transmission lines in the area are reliable.

PPL offered the testimony of its Supervising Engineer in the Transmission Planning Department, Lisa Krizenoskas

(Krizenoskas), to rebut the opinions of McGavran. Krizenoskas explained that the project is not intended to directly reduce or eliminate the number of system outages. Rather, the project is intended to reduce the duration of individual outages and improve PPL's ability to restore service in the event of an outage. Rebuttal Testimony of Lisa Krizenoskas, at 2; R.R. at 173a.

Krizenoskas also explained that the reason PPL developed the RP & P Guidelines was "to assure adequate and appropriate levels of service consistent with good utility practices." She stated that the RP & P Guideline which pertains to the amount of load exposed to an interruption "is derived from the emergency rating of standard 69 kV line conductor which is 120 MVA." *Id.* at 4; R.R. at 175a. PPL's RP & P "loading guideline of 60 MVA for a 69 kV allows for emergency transfers to restore load from an adjacent line, if available." *Id.* She explained that PPL "has applied this methodology to the development of the power system since the 1980s and this design philosophy has provided for a highly reliable power system that is consistent with good utility practice." *Id.* at 5; R.R. at 176a. "This methodology has also been presented to the Commission as the basis for PPL's planning decisions in numerous transmission project applications over the last thirty years." *Id.*

Krizenoskas did not agree with McGavran's opinion that the better alternative was to add a second circuit to the "Sunbury–Middleburg" 69 kV transmission line. Krizenoskas explained that PPL considered this alternative. However, it concluded that adding a second circuit to the Sunbury–Middleburg 69 kV transmission line would not resolve the reliability violations that are addressed by the New Transmission Tie Line and New Substation. Also, the structures which make up the Sunbury–Middleburg 69 kV line are not designed to accept a double circuit and therefore they would have to be replaced. This would entail additional removal costs, and the rebuild of approximately 12.5 miles, which is about 1.5 miles longer than the proposed project. *Id.* at 15; R.R. at 186a. It would also involve "an increase in the width of the existing right-of-ways" and there are "congested residential areas along the line route where widening of the right-of-ways may be impossible, because of the presence of 14 non-condemnable properties." *Id.* at 16; R.R. at 187a. She also emphasized that the line switching capability that the New Transmission Tie Line was intended to create would not be met by reconductoring (add electric circuit to) the existing lines.

PPL presented the testimony of Supervising Engineer, Howard Slugocki (Slugocki), who testified about the need for the New Substation. He explained that the Distribution Planning Department identified the "Dalmatia 3602" circuit as one that does not meet the Distribution RP & P Guidelines "for miles or circuit and for customer count per feeder." Rebuttal Testimony of Howard Slugocki at 2; R.R. at 193a. "Specifically, the Dalmatia 36–02 distribution line serves over 2,200 customers and supplies 194 miles of line. The Distribution RP & P Guidelines provide for no more than 1,300 customers per line and 50 miles of line." *Id.* "The Distribution Planning Department identified that an additional substation in the region with additional 12 kV distribution lines would help relieve the Dalmatia 36–02 line and reduce customers exposed to an outage." *Id.*

Slugocki testified that "this line has consistently been one of the worst performing circuits in PPL Electric's system, having been present on the worst performing circuits list 16 of the last 31 quarters." *Id.* at

3; R.R. at 194a. According to Slugocki, Commission regulations require PPL to file annual reports regarding the 5% of circuits on its system that are classified as the worst performing circuits. 52 Pa.Code § 57.195. This determination is based on the number of outages and the duration of those outages. Slugocki at 3; R.R. at 194a. The New Substation and the splitting of a single distribution line into multiple lines will not reduce the number of individual outages, but it will "greatly reduce the number of customers affected by individual outages" by reducing the number of circuit miles per feeder. *Id.* at 4; R.R. at 195a. Slugocki testified that PPL has exhausted all other reasonable interim fixes that would provide any "meaningful improvement to reliability." Rejoinder Testimony of Howard Slugocki, at 3.

PPL also offered the testimony of an independent engineering consultant, Richard Wodyka (Wodyka), to rebut the opinions of McGavran. Wodyka was employed for thirty-two years by PJM Interconnection, LLC (PJM). PJM is the Regional Transmission Organization (RTO) that manages the reliability of the largest centrally dispatched electric power grid in North America. Rebuttal Testimony of Richard Wodyka, at 3 and 6; R.R. at 207a and 210a. Wodyka served on the North American Electric Reliability Corporation (NERC) Planning and Engineering Committee for ten years.

Wodyka explained that PJM is involved in PPL's non-BES projects, including the one at issue. PJM staff monitors the planning of facilities (under 100 kV) such as the one proposed by PPL. Each "Local Plan" is reviewed by a committee to identify reliability criteria violations and proposed solutions. *Id.* at 10; R.R. at 214a. Once reliability criteria violations are resolved, the Local Plan is approved for implementation. The New Transmission Tie Line and New Substation project was working its way through PJM's Regional Transmission Expansion Planning (RTEP) process. *Id.* at 13; R.R. at 217a.

Wodyka is familiar with PPL's reliability planning process based on the company's involvement in the PJM planning process. He opined that PPL "utilizes good utility practices in evaluating its transmission system." *Id.* at 17–18; R.R. at 221a–222a.

He is also familiar with PPL's RP & P Guidelines and believes that they are "consistent with the reliability criteria and standards that other transmission utilities utilize in similarly situated suburban/rural operating environments." *Id.* at 21; R.R. at 225a. He explained that the RP & P Guidelines are critical in establishing the foundation of reliability standards and planning criteria for maintaining PPL's mandatory reliability standards. *Id.* at 26; R.R. at 230a. The RP & P Guidelines provide PPL's planning engineers with a comprehensive set of planning guidelines and criteria that enable them to plan for a reliable transmission and distribution system for its customers. *Id.* at 21; R.R. at 225a.

According to Wodyka, PPL updates its RP & P Guidelines from time to time as necessary to meet changing technical, economic, regulatory, business and social conditions. The RP & P Guidelines are "qualitative statements concerning the degree of reliability which PPL intends to provide its customers." *Id.* at 19; R.R. at 223a. The RP & P Guidelines recognize "the necessity of maintaining a proper balance between service reliability and the cost of that service and that large scale, long term, or frequent service interruptions are to be avoided because of the adverse effects on and hazards to the public." *Id.*

Wodyka opined that PPL's Guidelines are "not unique" but are "consistent with how other transmission utilities perform

system planning studies and make decisions regarding transmission/distribution upgrades for meeting future system reliability and customer needs in a prudent and cost efficient manner." *Id.* at 22; R.R. at 226. Wodyka opined that:

Based on my 40 years of planning experience, I believe that PPL Electric's RP & P guidelines for their transmission and distribution systems are reasonable, acceptable, and align well with NERC [North American Electric Reliability Corporation], NERC Regional Council, and PJM reliability planning criteria and standards, in accordance with good utility practice for reliable transmission planning in this region.

Rejoinder Testimony of Richard A. Wodyka, at 8; R.R. at 276a.

The ALJs held another hearing on September 11, 2012, at which the parties' witnesses were permitted to expound upon their written direct testimony and be cross-examined.

### ALJs Recommended Decision

The ALJs issued a Recommended Decision on December 4, 2012. They recommended that PPL's Applications be denied because PPL failed to meet its burden to prove that the New Transmission Tie Line and the New Substation "are necessary for the service, accommodation, convenience or safety of the public." Recommended Decision, December 4, 2012, at 37 and 41.

The ALJs made eighty findings of fact. They essentially accepted PPL's evidence that an outage on the Juniata–Richfield 69 kV line would result in a violation of PPL's RP & P Guidelines because approximately forty-four MW of load would remain interrupted for longer than two hours after all field switching and load transfers to other lines was completed. Recommended Decision, Findings of Fact (F.F.) 10 at 6. The ALJs also accepted that the New Trans-

mission Tie Line would provide more transmission capacity and load transfer capability to the two existing transmission lines to satisfy PPL's RP & P Guidelines in the event of an outage.

With regard to the "Dalmatia 36–02" 12 kV distribution line, the ALJs accepted PPL's evidence that it currently serves 2,200 customers and is 194 miles long. The ALJs accepted PPL's evidence that the proposed New Substation was directed at reducing the "number of customers affected by each outage and the duration of each outage." Recommended Decision, F.F. 38 at 10. The ALJs also accepted, as fact, that:

22. The Dalmatia 36–02 circuit has historically been one of PPL's worst performing distribution circuits. It was included in the first worst performing circuit report to the Commission, which was submitted for the third quarter of 2003. It has been on the worst performing circuits list quarters thereafter, making it a chronic worst performer.

\* \* \* \*

30. The identified violations [of PPL's RP & P Guidelines] result in greater exposure to outages due to the length of the circuit and large amounts of load being interrupted due to the large number of customers served.

31. Line exposure [i.e., length of the line] negatively impacts the reliability of a distribution line, such as the Dalmatia 36–02 line.

32. Fewer circuit miles per distribution line means that each distribution line has less potential exposure. Fewer circuit miles also reduces the amount of time it requires PPL to locate the cause of an outage on a distribution line.

33. Fewer customers per feeder means that, for an individual line outage, fewer customers will be affected.

* * * *

36. The Meiserville substation will enable PPL to split the Dalmatia·36–02 Line by adding two new 12 kV distribution lines out of the Meiserville substation.

37. The split brings the distribution system in the area into compliance with the RP & P Guidelines regarding the number of customers served by a 12 kV distribution line and enables PPL to reduce the length of the resulting lines so they are much closer to the RP & P.

Recommended Decision, F.F. 22, 30–33 and 36–37 at 8–10.

Despite crediting PPL's evidence, the ALJs concluded that PPL's evidence did not rise to the level of "need" as was demonstrated in *Energy Conservation Council of Pennsylvania v. Pennsylvania Public Utility Commission (TrAILCo)*, 995 A.2d 465 (Pa.Cmwlth.2010). Specifically, in *TrAILCo*, a "need" existed for a proposed high-voltage (HV) transmission system and substation within the meaning of 66 Pa.C.S. § 1501 and the Commission's HV regulations because the utility successfully demonstrated, by use of projections, that its proposed project would resolve future NERC standard violations and heavy congestion.

The ALJs also relied heavily on *Energy Conservation Council of Pennsylvania v. Pennsylvania Public Utility Commission (Susquehanna–Roseland Appeal)*, 25 A.3d 440 (Pa.Cmwlth.2011), where the utility established "need" because PJM directed it to construct a new transmission line to avoid overloading transmission facilities and violations of PJM's reliability planning standards.

While the ALJs recognized that the proposed project in this case was approved by PJM, the ALJs stressed that the project *"was not required by PJM"* and that "the project *was not in response to a directive or larger plan dictated by PJM*." Recommended Decision, at 20. (Emphasis added.) The ALJs found that the "record in this case does not demonstrate a need for the transmission line and substation based on PJM violations, NERC violations, stress modeling, lack of alternatives, heavy congestion, load growth, etc." Recommended Decision, at 37.

The ALJs noted that PPL's argument "relies significantly on its own Reliability Principles and Practices [RP & P Guidelines]. While these RP & P's are no doubt useful in increasing electric reliability and allow PPL to monitor its entire electric system, merely because a portion of that system violates that RP & P does not mean that a new transmission line and substation is needed and should be constructed." Recommended Decision, at 36. The ALJs found that "[v]iolations of PPL's own RP & P Guidelines do not equate to directives from PJM." Recommended Decision, at 37.[6]

*PPL's Exceptions and Protestants' Reply Exceptions*

PPL filed Exceptions on January 14, 2013. In one of its exceptions, PPL argued that the ALJs erred by finding that the project was unnecessary. PPL argued that it presented evidence which established that there are existing reliability issues on both the distribution (resolved by the New Substation) and transmission system (resolved by the New Transmission Tie Line). PPL further asserted that the

---

**6.** In the interests of providing a complete decision for the Commission to review, the ALJs went on to review the "proposed route" of the New Transmission Tie Line and found

that the route of the transmission line was reasonable and in compliance with all applicable standards. Protestants did not raise any challenges to the route chosen by PPL.

ALJs acknowledged in Finding of Fact No. 22 that the "Dalmatia 36–02" 12 kV distribution line is the worst performing, least reliable circuit on its distribution system.

On January 24, 2013, Protestants filed Reply Exceptions, and asserted that PPL *failed to produce evidence* that the "Dalmatia 36–02" 12 kV distribution line was on the list of PPL's worst performing circuits *in recent years* to sufficiently justify construction of the New Transmission Tie Line and New Substation. Protestants admitted that during the proceedings they never disputed that the "Dalmatia 36–02" 12 kV distribution line was a worst performing circuit, however, after the close of evidence, Protestants became "concerned" about the absence of evidence from PPL that the circuit appeared on the list recently. Protestants attempted to introduce new "quarterly reports on reliability" that PPL filed with the Commission pursuant to 52 Pa.Code § 57.195(c), and in particular, information contained in those reports regarding the worst performing 5% of circuits on PPL's system. Protestants conceded that these reports were not part of the record. However, they argued that the reports were "of public record" because they were filed with the Commission.

*Motion to Strike Portions of Protestants' Reply Exceptions*

On February 1, 2013, PPL filed a Motion to Strike the portion of Protestants' Reply Exceptions which disputed, for the first time in the proceedings, whether the "Dalmatia 36–02" 12 kV distribution line was a worst-performing circuit. PPL argued that Protestants attempted to present new evidence and arguments after the record closed which prejudiced PPL. PPL argued that had Protestants disputed that the "Dalmatia 36–02" 12 kV distribution line was a worst-performing circuit, PPL would have presented evidence demonstrating that it was consistently a very poor performing circuit and far less reliable than the vast majority of PPL's circuits.

*Commission's Decision*

In July 2013, the Commission issued an opinion and order: (1) granting PPL's Motion to Strike portions of Protestants' Reply Exceptions disputing the performance of the "Dalmatia 36–02" 12 kV distribution line; (2) adopting the ALJs' recommendation to the extent it approved the *route* of the New Transmission Tie Line; and (3) granting PPL's Exceptions to the extent that PPL requested the Commission to find the New Transmission Tie Line and New Substation necessary or proper for the service, accommodation, convenience, or safety of its patrons, employees and the public.

The Commission determined, based on PPL's RP & P Guidelines, there are a number of reliability issues with the existing "Dalmatia 36–02" 12 kV distribution line that warrant construction of the New Transmission Tie Line and New Substation. The Commission found that PPL demonstrated that there were "current, substantial reliability issues" regarding the "Dalmatia 36–02" 12 kV distribution line and that customer outages will be of longer duration absent the project. PPL presented substantial evidence regarding the reliability issues with the "Dalmatia 36–02" 12 kV distribution line, the inability of PPL to switch load in the event of a single contingency outage on that line, PPL's prior efforts to improve reliability and the lack of suitable alternatives. Commission Decision, July 16, 2013, at 33.

The Commission concluded that Protestants' proposed standard for finding "necessity" was much too narrow. The Commission found that the ALJs imposed an impermissibly narrow standard because

they erroneously focused on "necessity" from the standpoint of correcting or preventing violations of PJM or NERC standards, which do not apply to this project. The Commission explained that PJM and NERC reliability standards apply to BES systems over 100 kV, not PPL's non-BES systems which operate well-below 100 kV. Thus, the *TrAILCo* and *Susquehanna–Roseland* cases, which relied on PJM directives to show need for 15 Pa.C.S. § 1511(c), were inapplicable. The Commission found that the ALJs' reliance on the lack of PJM or NERC reliability violations did not represent a substantial evidentiary failure on PPL's part because these circumstances were not essential to a showing of necessity.

The Commission found instead that "the combination of reliability issues, together with previous efforts at smaller system upgrades which fail to alleviate the problem, can show need in appropriate circumstances." Commission Decision, July 16, 2013, at 31. The Commission found that the ALJs failed to give sufficient weight to PPL's evidence regarding current system reliability and the need to make improvements above and beyond minor system upgrades.

The Commission further found that PPL considered various alternatives to the proposed project, including the alternatives suggested by Protestants, but found them to be more expensive and less viable than the proposed project.

The Commission granted PPL's Motion to Strike Portions of Protestants' Reply Exceptions and found that it would be improper and contrary to the requirements of due process for the Commission to rely on extra-record facts presented for the first time in the Protestants' Reply to Exceptions. The Commission found that even though the facts may be from a public record, these facts were available to Protestants during the proceedings, and Protestants' failure to present them deprived PPL of the opportunity to respond.

 On appeal,[7] Protestants raise the following issues: (1) whether the Commission erred in determining, in reliance upon PPL's own RP & P Guidelines, that PPL's proposed project was necessary; (2) whether the Commission erred as a matter of law when it concluded that PPL's proposal constituted the "best alternative available;" (3) whether the Commission's conclusion that PPL's proposal constituted

**7.** This Court's scope of review of the Commission's adjudication is limited to determining whether the necessary findings of fact were supported by substantial evidence, whether constitutional rights were violated, or whether the Commission erred as a matter of law. *PECO Energy Co. v. Pa. Public Utility Commission*, 568 Pa. 39, 791 A.2d 1155 (2002).

This Court will not substitute its discretion for that properly exercised by the Commission. *Rohrbaugh v. Pa. Public Utility Commission*, 556 Pa. 199, 727 A.2d 1080 (1999). The Commission's expert interpretation of an aspect of utility law is entitled to great deference and will not be reversed unless clearly erroneous. *Popowsky v. Pa. Public Utility*, 550 Pa. 449, 706 A.2d 1197 (1997). Judicial deference to the views of the agency when implementing a statutory scheme is neces-

sary, especially when that scheme is complex. *Popowsky*, 706 A.2d at 1197.

Additionally, the Commission is the ultimate finder of fact empowered to determine the credibility of witnesses and to resolve conflicts in evidence. The Commission, not the Administrative Law Judge, is the ultimate fact finder. *Greene Township Board of Supervisors v. Pa. Public Utility Commission*, 164 Pa.Cmwlth. 88, 642 A.2d 541 (1994). The Commission's findings are conclusive where they are supported by substantial evidence. *Consol. Rail Corp. v. Pa. Public Utility Commission*, 155 Pa.Cmwlth. 537, 625 A.2d 741 (1993). The Commission's legal conclusions drawn from its findings, however, remain subject to judicial review. *Taylor v. Unemployment Compensation Board of Review*, 474 Pa. 351, 378 A.2d 829 (1977).

the "best alternative available" was based on substantial evidence; and (4) whether the Commission erred by striking portions of Protestants' Reply to Exceptions as improper new argument and extra-record evidence?

The Commission is the agency responsible for enforcing and implementing Section 1511(c) of the BCL. The "Legislature has vested in the [Commission] exclusive authority over the complex and technical service and engineering questions arising in the location, construction and maintenance of all public utilities facilities." *County of Chester v. Philadelphia Electric Co.*, 420 Pa. 422, 218 A.2d 331, 333 (1966). As acknowledged by this Court, the statutory and regulatory scheme regarding the approval of the siting and construction of transmission lines is technically complex, and a reviewing court should put aside its discretion in favor of the Commission's expertise. *Energy Conservation Council of Pennsylvania v. Pa. Public Utility Commission*, 995 A.2d 465, 478 (Pa.Cmwlth.2010). Therefore, the Commission's determination of whether the New Transmission Tie Line and New Substation are "necessary or proper for the service, accommodation, convenience or safety of the public" is entitled to "strong deference" and "given controlling weight unless it is clearly erroneous." *Riverwalk Casino, L.P. v. Pennsylvania Gaming Control Board*, 592 Pa. 505, 926 A.2d 926, 940 (2007).

## I.

In their first issue, Protestants argue that the Commission erred when it considered violations of PPL's RP & P Guidelines as a basis for finding "need" or "necessity" because PPL's "self-imposed" guidelines are not "mandatory" in nature. Protestants argue that "in order to be necessary, there must be something man-

datory, something akin to a directive or regulatory requirements." Protestants' Brief at 28. Protestants assert that to demonstrate "reliability issues" the utility must demonstrate a violation of mandatory standards and directives such as those set forth by the NERC and PJM in *TrAILCo* and *Susquehanna–Roseland.* Protestants contend that the hallmark of "necessity" or "need" in these cases is "the need to correct imminent violations or an authoritative directive to do so." Protestants' Brief at 27. Protestants posit if a utility could justify desired projects on its own subjective standards and internal principles, there would virtually be no limits to its power to condemn. PPL claims "PPL's project must be objectively unavoidable, not simply desirable from PPL's viewpoint." Protestants' Brief at 27.

### There are No Mandatory NERC or PJM Standards Which Apply to 69 kV Transmission Lines

Initially, this Court concurs with the Commission that Protestants' reliance on *TrAILCo* and *Susquehanna–Roseland* is misplaced.

*TrAILCo* and *Susquehanna–Roseland* represent examples where circumstances justified condemnation for proposed high voltage projects intended to remedy NERC and PJM reliability standard violations. PJM is responsible for planning the BES, which is defined as 100 kV and above. NERC and PJM standards apply to BES. NERC and PJM reliability criteria do not apply to non-BES, i.e., transmission lines which operate *below* the bulk power system level of 100 kV. There are no analogous NERC or PJM standards or directives which apply to the 69 kV transmission line involved here. Protestants have not identified any standard or directive, analogous to the NERC and PJM

reliability standards, which PPL *could* have cited.

Reliance on those cases in this instance is misplaced because there are no equivalent standards which apply to non-BES. Protestants' interpretation of *TrAILCo* and *Susquehanna–Roseland* would establish an impossible standard for PPL to meet.

### The "Absolute Necessity" Standard Proposed by Protestants is Impermissibly Narrow

Protestants further contend that a project must not be deemed "necessary or proper for the service, accommodation, convenience or safety of the public" under 15 Pa.C.S. § 1511(c) unless the project is "absolutely required," for example, to avoid imminent "line overloading" and "permanent damage." Protestants' Brief at 27–28. Protestants rely on the Commission's decision in *Application of PPL Electric Utilities (Chestnuthill)*, A–2010–2152104 (Pa.P.U.C., March 18, 2011), where the Commission found that a project was necessary because of overloading of the lines due to the rate of growth in the area. The Commission noted that the "current load on the . . . distribution lines and substation transformers requires *relief now*." (Emphasis supplied by Protestants). The Protestants argue that, here, there was neither an expected load growth, nor any transmission line failure that justified the proposed project.

This Court agrees with the Commission that our courts have not required such a narrow standard to demonstrate necessity under 15 Pa.C.S. § 1511(c). Rather, courts have found necessity wherever the

project resulted in a benefit to the public, such as an improvement to the reliability of service or lower prices. *See e.g., Southeastern Pennsylvania Transportation Authority v. Pa. Public Utility Commission*, 991 A.2d 1021, 1023 (Pa.Cmwlth.2010), (Section 1511(c) ("requires the applicant to show that its proposed project is in the public interest")); *Phillips v. Pa. Public Utility Commission*, 181 Pa.Super. 625, 124 A.2d 625, 627 (1956) (utility demonstrated with substantial evidence that the proposed line was "connected with improvement of service.")

In *Phillips*, the Superior Court considered whether the Commission erred when it approved Philadelphia Electric Company's application to acquire a right-of-way across the Phillips' farm.[8] The purpose for the transmission right-of-way was to coordinate Philadelphia Electric's system "through the Bradford substation to assure adequate service to the Chester–Marcus Hook area." *Phillips*, 124 A.2d at 626. The proposed line would "integrate the network to enable it to supplement power deficient areas from adjacent areas having available capacity." *Id.* Philadelphia Electric demonstrated that "the whole enterprise . . . will provide for the integration of the present Chester generating station and the proposed Eddystone station with other stations of the Philadelphia Electric Company and other Atlantic Seaboard utilities." *Id.* Philadelphia Electric asserted that this was "essential to national defense and industrial expansion." *Id.*

The question before the Commission was whether "the evidence show[ed] that the proposed lines [were] necessary and

---

**8.** The statute in force in *Phillips* was former 15 P.S. § 1182, Act of May 9, 1889, P.L. 136, repealed by the Act of December 21, 1988, P.L. 144, No. 177, which is substantially the same as 15 Pa.C.S. § 1511(c). Although the Act of December 21, 1988 does not indicate that 15 Pa.C.S. § 1511 is derived from the 1889 Act as supplemented, former section 1182 and 15 Pa.C.S. § 1511 are substantially the same and, therefore, *Phillips* is instructive when interpreting 15 Pa.C.S. § 1511.

proper to furnish supplemental service?" *Phillips*, 124 A.2d at 627.

The Commission concluded that Philadelphia Electric demonstrated with substantial evidence that the proposed line was "connected with improvement of service." *Id.* Reviewing the Commission's order, the Superior Court found no evidence that the proposed line was "unnecessary, improper or not in furtherance of public service." *Id.*

The Superior Court found it sufficient that the utility demonstrated that the purpose of the proposed transmission line was to "integrate the network to enable it to supplement power deficient areas from adjacent areas having available capacity." *Phillips*, 124 A.2d at 626. The Superior Court noted that not only existing needs were to be considered but also future necessities. *Chew v. City of Philadelphia*, 257 Pa. 589, 101 A. 915 (1915).

In *Pennsylvania Power & Light Company v. Pennsylvania Public Utility Commission*, 696 A.2d 248, 249 (Pa.Cmwlth. 1997) (hereinafter *PP & L*), the Commission disapproved a project because it was not needed from an "engineering perspective," i.e., it was not needed to provide reliable service. On appeal, this Court reversed. In reviewing the "engineering perspective" standard applied by the Commission, this Court found that:

> Nowhere in any of the … statutory or regulatory provisions, nor in any other regulations promulgated under the Code, is there a requirement that the necessity which must be shown by a public utility corporation, such as PP & L, seeking to construct a transmission line, is that of necessity from an engineering perspective as concluded by the PUC.

*PP & L*, 696 A.2d at 250.

With respect to the standard to establish necessity, this Court held that "the Com-mission should consider the electric power needs of the public, the state of the available technology and the available alternatives." *PP & L*, 696 A.2d at 250.

■ Here, the Commission determined that "a combination of reliability issues, together with previous small efforts at small system distribution upgrades which fail to alleviate the problem, can show need in appropriate circumstances." Commission Decision at 31. The Commission's standard is consistent with the caselaw and the clear language of 15 Pa.C.S. § 1511(c) which is aimed at ensuring that the power of condemnation is exercised only for those projects which are necessary for the service, accommodation, convenience or safety of the public.

■ Specifically, the Commission considered the electric power needs of the public, and the current substantial reliability issues identified by PPL. The Commission was convinced by PPL's evidence that a problem existed which compromised PPL's statutory obligation to provide service that was adequate, safe, efficient, and reasonable and without unreasonable interruptions and delay. 66 Pa.C.S. § 1501. PPL established that there is no existing load transfer capability in the project area. The ability to transfer load shortens the duration of outages. PPL provided testimony that an inordinate number of customers in the project area are at risk of sustained outage should a single contingency outage occur. PPL provided evidence that it attempted to resolve issues by other measures, to no avail. PPL considered other alternatives and presented the preferred alternative to the Commission for approval. The Commission concluded that the New Transmission Tie Line will benefit the public by improving the ability to transfer the load interrupted for an outage of the Juniata–Richfield

transmission line, and reducing the duration of outages on the Juniata–Richfield transmission line and allow faster load restoration for thousands of PPL customers served by this line. The Commission also concluded that the New Substation will benefit the public by reducing the total number of customers affected by an outage on the "Dalmatia 3602" 12 kV distribution line from 2,200 to 500, and reducing the duration of outages.

This Court discerns no error in the standard applied by the Commission to arrive at the conclusion that PPL's proposed project, which is designed to minimize the magnitude and duration of future outages in the area, will result in a benefit to public.

PPL is statutorily required to be proactive and constantly monitor its systems to identify reliability concerns and to determine, *inter alia*, if and when updates or improvements are needed to minimize the magnitude and duration of future outages. Under Protestants' proposed standard, utilities could only seek approval under 15 Pa.C.S. § 1511(c) when a problem is looming and the resolution is "absolutely necessary." Utilities would essentially have to wait until an existing system fails before seeking approval of a project. Not only would this approach be impractical and unrealistic, it would actually pose a danger to the health, safety and welfare of the public.

The Commission did not err when it rejected Protestants' proposed "absolute necessity" standard.

*The Commission did not Err By Considering PPL's RP & P Guidelines as Evidence That There Were Reliability Issues in the Project Area*

Next, Protestants assert that it was erroneous to use PPL's RP & P Guidelines as the measure of reliability because the guidelines were not "mandatory" and they were "self-imposed;" the implication being that they were somehow untrustworthy, or biased in favor of PPL.[9] This Court must disagree.

■ By labeling the RP & P Guidelines as "self-imposed" and "subjective" Protestants mischaracterize PPL's RP & P Guidelines. Protestants, without more, lay emphasis on the fact that the RP & P Guidelines were developed internally by PPL, as opposed to a regulatory commission or body. In so doing, Protestants erroneously imply that the RP & P Guidelines were "voluntary" when in fact the public utility regulatory scheme *required* PPL to maintain internal planning guidelines. To that end, Commission regulations require electric utilities to design and maintain procedures and criteria to ensure continuous, safe and reliable electric service. 52 Pa.Code §§ 57.193–57.194. Section 2802(20) of the Code, 66 Pa.C.S. § 2802(20), requires electric utilities to establish their own inspection, maintenance, repair and replacement standards based on the unique circumstances facing each utility.

Protestants also imply that the RP & P Guidelines are not legitimate and may be easily fabricated or exaggerated to inure to the sole benefit of PPL. However, Protestants ignore PPL's undisputed evidence that the Guidelines "comply with and support NERC Planning Standards, the RFC regional planning criteria and standards and the PJM planning criterial and RTEP protocols." Rebuttal Testimony of Richard Wodyka, at 25; R.R. at 229a.

Indeed, Protestants do not challenge any one Guideline as being unreasonable.

---

9. Protestants do not elaborate other than to allude to the need to protect citizens from a utility's "economic self-interests." Protestants' Brief at 30.

They also fail to explain how PPL's RP & P Guidelines, even though "self-imposed," fell short of identifying legitimate reliability concerns. PPL presented undisputed evidence that, given the present state of its system, 44 MW of load would remain interrupted for longer than two hours in the event of an outage. Protestants presented no evidence or argument to counter PPL's position that allowing forty-four MW of load to remain interrupted for longer than two hours during an outage was inconsistent with PPL's continuous statutory mandate to provide reliable service, which includes ensuring that the regional power system will sustain contingencies and disturbances (e.g., storm, lightening, accidents) with minimal customer interruptions.

There was no evidence that the RP & P Guidelines were arbitrary or untrustworthy. PPL presented evidence that its RP & P Guidelines are constantly reviewed and analyzed by the PJM. All of PPL's non-BES projects, which were based on violations of RP & P Guidelines, were presented to the PJM for approval as part of PJM's Regional Transmission Expansion Plan. Therefore, the Guidelines passed the scrutiny of superior third parties.

Further, evidence established that PPL's RP & P and regional planning processes have been developed and refined "since the 1980s using industry-wide experience and historical performance benchmarks." Rebuttal Testimony of Krizenoskas, at 4–5; R.R. at 175a–176a. Wodyka explained that PPL's RP & P Guidelines are "based on the experience of both PPL Electric and the industry at large in planning and operating transmission and distribution systems." Rebuttal Testimony of Wodyka, at 7; R.R. at 275. The Commission is thoroughly familiar with the RP & P Guidelines. By all accounts, the Commission has approved numerous projects over the past thirty years using PPL's RP & P Guidelines as a basis for establishing the need for projects. They are required by the Code and used by PPL to ensure appropriate levels of service that are consistent with good utility practice.

Protestants have provided no evidence whatsoever, other than broad sweeping remarks that the Guidelines are untrustworthy to identify system reliability issues. This Court will not conclude that the Commission erred when it considered RP & P Guidelines when determining that reliability issues existed in the project area.

## II.

Protestants contend that the Commission's finding that there was a need for PPL's proposed project was not supported by substantial evidence because PPL did not consider all available electrical solutions and that the proposed project was not the "best alternative available" to resolve PPL's alleged reliability problems with the "Dalmatia 36–02" 12 kV distribution line.[10]

Protestants contend they readily identified a number of "better" and "viable" alternatives which PPL failed to consider. For example, PPL could have installed heavier conductor on the existing corridor, which would have improved carrying capacity. Additionally, a double circuit to the south from the Sunbury substation would allow PPL to adequately serve the flat demand using existing corridors without the need for a new river crossing or

10. Although Protestants have characterized their second argument as an "error of law," a review of their Brief clearly reveals that Protestants are really asserting a substantial evidence challenge to the Commission's finding that the proposed project is needed. Accordingly, this Court will address Protestants' second and third issues together.

the taking of additional land. Protestants argue this alternative would make the entire project unnecessary. On the distribution side, Protestants contend that PPL could have updated the distribution system by running a third circuit from the Dalmatia substation while using existing rights-of-way and an existing river crossing. In addition, reconductoring and re-strengthening the current system also would have rendered the proposed project unnecessary. Finally, sending a third distribution line from the Dalmatia substation would have rendered the New Substation unnecessary.

Protestants argue that had the Commission given due consideration to *their* proposed alternatives, the Commission "could not have reached the conclusion that this project was the best alternative available." Protestants' Brief at 37. They assert that PPL only compared its project to one other alternative which it "quickly discarded" in favor of the "better" project. Protestants' Brief at 39.

██ First, Protestants' contention that PPL and the Commission ignored their suggested alternatives or any other alternatives is simply not supported by the record. The record reflects that PPL's Transmission Planning Group assessed a variety of potential engineering solutions and selected two for more thorough assessment. Those two solutions were identified as Alternative 1 and Alternative 2 in the Necessity Statement. PPL's witnesses testified in detail how each of the two alternatives were investigated and evaluated. The Commission found that PPL thoroughly examined other transmission alternatives and found that these alternatives were more expensive, less viable or that they failed to achieve PPL's reliability objectives in the project area. Additionally, the Commission found that the evidence supported the finding that there

were no additional distribution alternatives, other than those already exhausted by PPL, which would have resolved the reliability issues in the project area. For example, PPL installed re-closers and fuses at the proper locations using coordination methods and installed lightening arrestors on every distribution transformer in the project area. Despite these measures, the "Dalmatia 36–02" transmission line reappeared on the list of worst performing circuits.

Further, the record shows that every one of Protestants' alternatives proposed by McGavran, were addressed by PPL's witnesses and rebutted. PPL witness found many infirmities associated with Protestants' alternatives, including increased construction costs and time, right-of-way acquisition issues and maintaining service to existing customers. H.T., 9/11/12 at 224–227; R.R. at 351a–354a. The Commission credited PPL's witnesses and found that PPL's preferred alternative was appropriate. Evidence shows that many of McGavran's proposed solutions were geared to reducing the number of outages on the lines in the project area. However, PPL stressed time and again that the goal of the proposed project was not simply to reduce the number of outages, but the duration of the outages and number of customers affected. PPL's witnesses specifically testified that simply rebuilding or reconductoring the existing lines with a larger conductor would still leave an unacceptable amount of load interrupted under PPL's RP & P Guidelines in the event of an outage on either the Juniata–Richfield or Sunbury–Dauphin transmission lines. Rejoinder Testimony of Justin Wehr at 2; R.R. at 243a.

██ The Commission is the ultimate fact finder empowered to weigh the evidence and resolve conflicts in the testimony. *Popowsky,* 706 A.2d at 1201. Protes-

tant's argument is nothing more than a request for this Court to reweigh and accept the evidence presented by Protestants which was rejected by the Commission. Protestants present the same evidence to this Court and ask this Court to decide that their alternatives were better or more viable. However, the mere fact that conflicting evidence may appear in the record does not mean that substantial evidence was lacking. *Allied Mechanical and Electrical, Inc. v. Pennsylvania Prevailing Wage Appeals Board,* 923 A.2d 1220, 1228 (Pa.Cmwlth.2007). Further, it is not the function of this Court to review the alternatives presented by Protestants and decide if those alternatives are a "better" solution than the proposed project. This Court must put aside its discretion in favor of the Commission's expertise and not substitute our judgment for that of the Commission unless it is clearly erroneous. *Riverwalk Casino,* 926 A.2d at 940.

This Court has thoroughly reviewed the Commission's Decision, the briefs and the entire record, and it concludes there was substantial evidence to support the Commission's finding that PPL considered alternative solutions and that Protestants' alternative solutions would not resolve the reliability issues identified in the project area.

### III.

Lastly, Protestants assert that the Commission erred by striking portions of their Reply to Exceptions as improper new argument and extra-record evidence.

In support of its Applications, PPL presented evidence *via* witness testimony that the Dalmatia "36–02" 12 kV transmission line was on the list filed with the Commission pursuant to 52 Pa.Code § 57.195(e), of PPL's "worst performing" 5% of circuits for 16 out of the last 31 quarters, and that it was a poor performing circuit. PPL did not introduce the actual quarterly lists to support this contention. Protestants presented no evidence challenging this assertion and they did not cross-examine PPL's witnesses on the matter.

For the first time in these proceedings, however, on pages 14–16, and 18–19 of their Reply to PPL's Exceptions, Protestants asserted that the Dalmatia "36–02" 12 kV transmission line appeared on the "worst performing list" for only one of the sixteen most recent quarters and it did not appear on the worst performing list any time immediately preceding PPL's Applications sufficiently to justify the proposed project. In support of this argument, Protestants attempted to cite to and rely upon the new, most recent quarterly reports on reliability filed with the Commission pursuant to 52 Pa.Code § 57.195(c). It is undisputed that the "new" quarterly report information relied upon by Protestants is not part of the record in this proceeding. According to Protestants, after the record closed, they became "concerned about the absence of any evidence from PPL that the circuit appeared on the list recently." Protestants' Brief at 42.

Protestants admit that they raised this issue for the first time in their Reply Exceptions. Protestants also concede that:

It is true that the Commission has rejected attempts by parties to establish new facts or make up new arguments in the exceptions state of a proceeding. See *Application of Apollo Gas Co.,* 1994 WL 578036 (Pa.P.U.C.1994) (*Apollo* ). Admitting such new matter late in a proceeding can deprive an opposing party of an opportunity to test the reasonableness of the evidence or to respond to the newly-raised issues. See *Pa. Public Utility Commission v. Pennsylvania Gas and Water Company Water Division,* 0088 WL 1535043 (Pa.P.U.C.1988);

*Enron Capital & Trade Resources Corporation v. The Peoples Natural Gas Company,* 1998 WL 817682 (Pa.P.U.C. 1998); *Pa. Public Utility Commission v. Mechanicsburg Water Company,* 1993 WL 542874 (Pa.P.U.C.1993).

Protestants' Brief at 41.

Despite these concessions, Protestants contend they did not attempt to inject a new fact or argument at the eleventh hour. Protestants claim that the "factual material" that the Commission concluded they were trying to introduce "was already well-referenced in the record, on file with the Commission and created by PPL." *Id.* Protestants assert they did not submit anything new, but merely pointed out PPL did not proffer any evidence regarding the "Dalmatia 3602" 12 kV distribution line's performance in the quarters immediately preceding the ALJs' decision. In short, Protestants maintain they merely sought to clarify the potentially misleading manner in which PPL presented its information.

■■■ The Commission, as an administrative body, is bound by the due process provisions of constitutional law and by the principles of common fairness. *Bridgewater Borough v. Pa. Public Utility Commission,* 181 Pa.Super. 84, 124 A.2d 165 (1956); *McCormick v. Pa. Public Utility Commission,* 151 Pa.Super. 196, 30 A.2d 327 (1943). Among the requirements of due process are notice and an opportunity to be heard on the issues, to be apprised of the evidence submitted, to cross-examine witnesses, to inspect documents, and to offer evidence in explanation or rebuttal. *Davidson Unemployment Compensation Case,* 189 Pa.Super. 543, 151 A.2d 870 (1959); *Shenandoah Suburban Bus Lines, Inc.,* 158 Pa.Super. 638, 46 A.2d 26 (1946).[11]

■■■ This Court finds that the Commission properly afforded PPL the due process protections the law requires and did not abuse its discretion when it granted PPL's Motion to Strike the portion of Protestants' Reply Exceptions which disputed, for the first time in the proceeding, that the "36–02 Dalmatia" 12 kV transmission line was a worst-performing circuit.

This Court does not agree that Protestants' introduction of "new" quarterly reports which purported to show the absence of the "36–02 Dalmatia" 12 kV transmission line as a worst performing circuit was merely a recharacterization of the "exact same information that PPL introduced and relied upon." Protestants' Brief at 42. (Emphasis added.) Rather, it was tantamount to raising an entirely new argument at a stage when PPL had no opportunity to respond.

■■■ The record closed on September 12, 2012. At no time prior to filing their Reply to Exceptions did Protestants contest or otherwise dispute PPL's position that the "36–02 Dalmatia" 12 kV transmission line appeared on PPL's list of worst performing circuits 16 of 31 quarters. Protestants had every opportunity to cross-examine PPL's witnesses on this

---

**11.** In *Application of Apollo Gas Co.,* 1994 WL 578036 (Pa.P.U.C.1994), the Commission held that it is inappropriate to offer public documents into evidence through Exceptions. In that case, the Commission was faced with a similar situation. In its Exceptions, Equitable Gas Company argued that the Commission should rely on exhibits filed by Apollo Gas Company in a separate proceeding before the Commission. The exhibits had not been presented as evidence during the Application of Apollo's proceeding and were therefore not a part of the record evidence. The Commission granted Apollo's Motion to Strike those exhibits from Equitable's Exceptions, stating that "[w]hile a litigant may be permitted under Section 5.406 [of the Code, 52 Pa.Code § 5.408] to offer public documents into evidence, that section does not grant a party the right to present such evidence after the record has closed." *Application of Apollo* at *13–24.

point. They did not do so. They also had every opportunity to introduce PPL's quarterly reports into the record. They did not do so. PPL would have been clearly prejudiced if the argument and evidence was allowed in after the record closed because PPL had no opportunity to respond to this evidence and the arguments based on it.[12]

Accordingly, this Court is unable to conclude that the Commission abused its discretion when it granted PPL's Motion to Strike.[13]

The order of the Commission is affirmed.

### ORDER

AND NOW, this 22nd day of December, 2014, the Order of the Pennsylvania Public Utility Commission in the above-captioned matter is hereby AFFIRMED.

### DISSENTING OPINION BY Judge LEAVITT.

Respectfully, I dissent. I would affirm the conclusion of the administrative law judges that PPL Electric's (PPL) plan to place a new transmission line across the Susquehanna River in a pristine location is not necessary for the "service, accommodation, convenience or safety of the public." 15 Pa.C.S. § 1511(c). In any case, PPL's proposal to degrade the environment in this way does not, in my view, satisfy the test set forth in *Payne v. Kassab*, 11 Pa. Cmwlth. 14, 312 A.2d 86, 94 (1973) for evaluating the environmental impact of a project, which is subject to regulation by the Public Utility Commission.[1]

PPL's proposed eleven-mile long 69 kV transmission line, known as the Richfield–Dalmatia Line, will cross the Susquehanna River in Juniata County to connect two existing 69 kV transmission lines. A number of property owners (Protestants) objected to PPL's plan to install these large and unsightly transmission lines on their land. In addition, consumers and citizens testified in opposition. One witness, a fishing guide, noted that the power line crossing would despoil a beautiful part of the river:

> Hunting and fishing are multi-million dollar industries for the state, and one of

12. PPL asserts that the appropriate remedy would have been for Protestants to file a petition to reopen the record. Under 52 Pa. Code § 5.571 a record may be opened "if there is reason to believe that conditions of fact or of law have so changed as to require, or that the public interest requires, the reopening of the proceeding." While true, this Court is not convinced that this would have been successful. The Commission may deny a request where evidence of all of the additional facts alleged was available at the time of the hearing. *City of Philadelphia v. Pa. Public Utility Commission*, 185 Pa.Super. 598, 138 A.2d 698 (1958). Clearly, any evidence that the "Dalmatia 36–02" 12 kV distribution line was not on the list *immediately prior to* the time PPL filed its Applications would have been available to Protestants *at the time of* the hearing.

13. Protestants contend that the Commission should have taken judicial notice of the quarterly reports because they were filed with the Commission at Docket No. L–00030161. Protestants miss the point. Even if the Commission took judicial notice of the contents of the worst-performing circuits list, at the Exceptions stage, PPL *had no opportunity to respond to Protestants' argument* with rebuttal evidence.

1. In *Payne*, citizens of the City of Wilkes–Barre along with several students attending Wilkes–Barre College sought to prevent a street widening project. The project required the taking of approximately one-half acre of land from the River Common, which was essentially a local park. This Court determined that the project complied with the applicable environmental regulatory statute, that reasonable efforts were made to minimize the environmental impact, and that the public benefit from the project outweighed the environmental harm.

the serious problems facing these industries are loss of habitat. Another power line crossing will mean loss of habitat, plus another scar upon the land.

ALJs' Recommended Decision at 31 (quoting from page 54 of the transcript).[2] Another witness noted that there already exists a river crossing one mile north of the proposed crossing that should have been used. *Id.* Other witnesses testified about the loss of agricultural land. *Id.*

Ironically, the ALJs did not disapprove PPL's project because of its environmental degradation. Indeed, the ALJs held that because a 69 kV transmission line is not a "high voltage" line, it is not governed by the Public Utility Commission's regulation at 52 Pa.Code §§ 57.1–57.77, and, thus, *Payne v. Kassab* did not apply. The Commission adopted this holding of the ALJs.[3]

This regulation was adopted to implement Article I, Section 27 of the Pennsylvania Constitution. There is no rationale for not including a 69 kV transmission line within the ambit regulation because it will have the same negative impact on the environment as a high-voltage transmission line. It will involve clearing a wide swath of land and leave in its place unsightly transmission poles and lines. Article 1, Section 27, known as the Environmental Rights Amendment, states:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27. Nothing in this constitutional amendment supports the arbitrary line drawn by the Public Utility Commission between high voltage transmission lines and 69 kV transmission lines. In short, before approving the Richfield–Dalmatia Line, the Commission should have required PPL to show that its new line satisfied *Payne v. Kassab.*

The Commission issued its adjudication before the issuance of *Robinson Township v. Pennsylvania Public Utility Commission,* 623 Pa. 564, 83 A.3d 901, 952 (2013). In *Robinson Township,* a plurality of our Supreme Court explained that the Environmental Rights Amendment requires "each branch of government to consider in advance of proceeding the environmental effect of any proposed action [on the environment]." Additionally, the Supreme Court stated that "economic development cannot take place at the expense of an unreasonable degradation of the environment." *Id.* at 954.

The Supreme Court in *Robinson Township* explained that this Court's test established in *Payne v. Kassab* applies to cases involving a "failure to comply with statutory standards enacted to advance Section 27 interests." *Id.* at 967. The Supreme Court suggested that the constitutional duties of executive agencies should not be dependent upon legislative enactments or quasi-legislative regulations, such as the one applicable to high voltage transmission lines. *Id.*

PPL's project is not being undertaken because of a projected need increased demand for service but, rather, to allow PPL to satisfy its own self-imposed guidelines on reliability. Notably, PPL invokes these guidelines on a selective basis. This is not

---

2. Page 54 of the transcript is not part of the reproduced record.

3. Protestants did not raise this issue in its appeal to this Court, and I acknowledge this cannot be a basis for reversal. The error was

the Commission's conclusion that the new line was needed, an error that will have a negative and lasting impact on Pennsylvania's natural resources.

"need" within the meaning of the Public Utility Code. PPL acknowledges that the Richfield–Dalmatia Line will not prevent outages caused by bad weather but, at most, will speed up restoration of service. The risk of future outages will be increased by the fact that there will be 11.54 additional miles of transmission lines exposed to weather. I agree with Protestants that PPL does not need the transmission tie line to provide reliable service and that Protestants' proposed alternatives for improving reliability were rejected by the Commission without a sound basis. Those alternatives would advance the rights of the people under Article I, Section 27 of the Pennsylvania Constitution.

For these reasons, I would reverse.

Judge McCULLOUGH joins in the dissent.