# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Transource Pennsylvania, LLC, and : 
PPL Electric Utilities Corporation, : 
                   Petitioners : 
                    : 
          v. : No. 689 C.D. 2021
                    : Argued:  March 7, 2022
Pennsylvania Public Utility : 
Commission, : 
                 Respondent : 


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE ELLEN CEISLER, Judge
                 HONORABLE LORI A. DUMAS, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER      FILED:  May 5, 2022

Transource Pennsylvania, LLC (Transource) and PPL Electric Utilities Corporation (PPL) (together, Petitioners) petition for review of the May 24, 2021 Opinion and Order of the Pennsylvania Public Utility Commission (Commission) that, in relevant part, denied an application and an amended application for the siting and construction of two high-voltage (HV) transmission lines related to the Independence Energy Connection (IEC) Project in Franklin and York Counties, Pennsylvania (Siting Applications), and rescinded the provisional certificate of public convenience (CPC) that the Commission had previously granted Transource for the IEC Project.  The Commission concluded that there was no error or abuse of discretion in the Administrative Law Judge's (ALJ) determination that Transource failed to establish the requisite need for the IEC Project under Section 57.76(a)(1)

of the Commission's Regulations (Regulations), 52 Pa. Code § 57.76(a)(1), or met the requirements of Section 1501 of the Public Utility Code (Code), 66 Pa.C.S. § 1501. The Commission held that the ALJ's findings of fact were supported by substantial evidence, in the form of the credited evidence submitted by opposing or objecting parties. The Commission further concluded that the ALJ's determinations, including that the Commission could evaluate the need for the IEC Project for purposes of Pennsylvania law independently of the evaluation of need for the IEC Project that had been performed by PJM Interconnection LLC (PJM), were consistent with the Code, the Regulations, and Pennsylvania law.[1]

On appeal, Petitioners argue that the Commission erred in interpreting Section 1501 of the Code and Section 57.76(a)(1) of the Regulations and used an incorrect standard in denying the Siting Applications. Petitioners assert that the findings of fact necessary to support the conclusion of a lack of need or necessity for the IEC Project were not supported by substantial evidence. As part of its evidentiary challenge, Petitioners assert that the Commission erred in rejecting PJM's findings as evidence of need for the IEC Project under Pennsylvania law and in focusing only on the negative impacts on local rates. Finally, Petitioners maintain that the Commission erred in rescinding the provisional CPC and not resolving the merits of Petitioners' other Exceptions based on its decision on the Siting Applications, and, therefore, this matter must be remanded.

---

[1] The ALJ also recommended denying the Siting Applications because Transource did not establish that it met the requirements of the other subparts of Section 57.76(a) of the Regulations and denying applications related to the construction of structures related to the IEC Project in Franklin and York Counties and to exercise the power of eminent domain over properties in Franklin County. (Recommended Decision (R.D.) at 103-24, Order.) Petitioners filed Exceptions to these determinations, but because the Commission affirmed the denial of the Siting Applications on the lack of need, it did not specifically address these Exceptions beyond finding that they were moot. (Commission Opinion and Order (Op. and Order) at 64-65, 67-73.)

The Commission and Intervenors, the Office of Consumer Advocate (OCA), the County of Franklin (Franklin County), and Stop Transource Franklin County (STFC), respond that the Commission's interpretations of the Code and the Regulations were not clearly erroneous and, therefore, are entitled to deference. They further argue that the Commission applied the correct standard in determining that Transource did not meet its burden of proof on the Siting Applications and rescinding the provisional CPC. The Commission and Franklin County also assert that Petitioners have waived certain of these issues as they had not been raised before the Commission. Intervenors and the Commission further argue that the findings of fact are supported by substantial evidence and that Petitioners' arguments to the contrary improperly seek to have this Court reweigh the evidence or to preclude the Commission from performing its own evidentiary review and consideration of the IEC Project. Finally, the Commission asserts there was no error in it not considering Petitioners' other Exceptions based on its determination on the Siting Applications.

## I. BACKGROUND

### A. Relevant Statutory Provisions

This matter involves the denial of the Siting Applications and the rescission of Transource's provisional CPC pursuant to Section 57.76(a) of the Regulations and Section 1501 of the Code. Section 1501 of the Code addresses, generally, the character of services and facilities of a public utility and provides, in pertinent part:

> Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public. . . . Such service and facilities shall be in conformity with the regulations and orders of the [C]ommission.

3

66 Pa.C.S. § 1501. Section 57.76(a) of the Regulations relates to the siting and construction of HV lines and states:

> (a) The Commission will issue its order, with its opinion, if any, either granting or denying the application, in whole or in part, as filed or upon the terms, conditions or modifications, of the location, construction, operation or maintenance of the line as the Commission may deem appropriate. The Commission will not grant the application, either as proposed or as modified, unless it finds and determines as to the proposed HV line:
>
> (1) That there is a need for it.

52 Pa. Code § 57.76(a)(1). Pursuant to Section 57.75(e)(1) of the Regulations, in reviewing a siting application, the Commission must accept evidence of, among other things, the "present and future necessity of the proposed HV line in furnishing service to the public." 52 Pa. Code § 57.75(e)(1).

In addition, this matter implicates Pennsylvania's participation in regional interstate power pools with other states, which is addressed in Section 2805(a) of the Code. Section 2805(a) provides:

> The [C]ommission shall take all necessary and appropriate steps to encourage interstate power pools to enhance competition and to complement industry restructuring on a regional basis. The Commonwealth, the [C]ommission and Pennsylvania electric utilities shall work with the Federal Government, other states in the region and interstate power pools to accomplish the goals of restructuring and to establish independent system operators or their functional equivalents to operate the transmission system and interstate power pools. The [C]ommission, Pennsylvania electric utilities and all electricity suppliers shall work with the Federal Government, other states in the region, the North American Electric Reliability Council [(NERC)] and its regional coordinating councils or their successors, interstate power pools, and with the independent system operator or its functional equivalent to ensure the continued provision of adequate, safe and reliable electric service to the citizens and businesses of this Commonwealth.

66 Pa.C.S. § 2805(a).[2]

*B. The IEC Project and Transource*

In 2014, PJM, the Regional Transmission Organization charged with managing electric utilities transmission systems in 13 states (PJM Region), that includes most of Pennsylvania, Maryland, Virginia, and West Virginia, performed an annual Regional Transmission Extension Plan (RTEP) of the PJM Region. (Commission Opinion and Order (Op. and Order) at 3.)[3] As part of the RTEP, PJM conducted a market efficiency analysis to determine if there were areas where market congestion[4] existed, which was found on the AP South Reactive Interface (APSRI). (*Id.*) "[O]n October 30, 2014, PJM opened a long-term RTEP proposal window" and sought "market efficiency proposals in order to alleviate congestion on the AP[SRI]." (*Id.*) During this process, it was projected that the "[c]ongestion on the AP[SRI] totaled approximately $800 million from 2012 to 2016." (*Id.*)

PJM received 41 proposals, and, on August 2, 2016, approved the market efficiency project, known as Project 9A, submitted by Transource Energy, Transource's parent, to alleviate the APSRI congestion. (*Id.* at 2-3.) Project 9A is a set of 4,500 kV transmission lines originating in West Virginia and terminating in Maryland. (*Id.* at 3.) The IEC Project is the Pennsylvania portion of Project 9A, and consists of IEC West, located in Franklin County, and IEC East, located in York

---

[2] Section 2805(a) is located in Chapter 28 of the Code, which deregulated Pennsylvania's electric utility industry. *See* Section 2802 of the Code, 66 Pa.C.S. § 2802 (announcing the declaration of policy to, among other things, deregulate the electric utility industry to encourage greater competition in the wholesale electric market).

[3] The Commission's Opinion and Order is located at volume 7 pages 6427a through 6506a of the Reproduced Record.

[4] "Congestion occurs when the least costly resources that are available to serve load in a given region cannot be dispatched because transmission facility limits constrain power flow on the system." (Recommended Decision, Finding of Fact ¶ 35.)

County, and involves HV transmission lines from new substations in those counties to the Pennsylvania/Maryland border. (*Id.* at 3, 5-6.) Transource was "formed solely to carry out . . . Project 9A." (*Id.* at 2-3.)

Transource filed an "Application for All of the Necessary Authority, Approvals, and Certificates of Public Convenience" relating to the IEC Project on February 8, 2017. (*Id.* at 4.) The Commission recognized that Transource was "a new type of entity in" Pennsylvania and was formed only to "carry out a particular market efficiency project." (*Id.* at 5 (internal quotations omitted).) On January 23, 2018, the Commission issued the provisional CPC, and its provisional approval referenced, specifically, Project 9A, including the IEC Project, as a means to resolve congestion on the APSRI.[5] (*Id.* at 4 (citing *Application of Transource, Pennsylvania, LLC*, Docket Nos. A-2017-2587821 & G-2017-2587822 (PUC Jan. 23, 2018)).) Although the provisional CPC was granted, "all parties reserved the right to challenge the need for the [IEC] Project when Transource file[d] a siting application with the Commission or to challenge any other project proposed by Transource." (*Id.* at 5.) Transource subsequently filed additional applications relating to the construction of buildings or shelters and the exercise of eminent domain over various properties in Franklin and York Counties. (*Id.* at 8.) PPL, an intervenor in the Commission proceedings, became involved in the IEC East portion when it and Transource entered into an agreement allowing Transource to utilize PPL's existing transmission infrastructure and rights-of-way for the IEC East portion of the IEC Project.[6] (*Id.* at 14-16.) As the design of the IEC Project was altered, Transource

---

[5] The approval of the provisional CPC was part of a settlement agreement.

[6] As a result of this agreement, there was no need for Transource to use eminent domain in York County.

amended its various applications, including by adding PPL to the applications relevant to the IEC East portion.

### C. Proceedings Before the ALJ and the Recommended Decision

Transource's applications were assigned to an ALJ[7] for disposition. OCA, STFC, and Franklin County, among others, intervened before the ALJ, with other landowners, citizens, and entities filing protests.[8] Between January 8, 2018, and September 25, 2020, the ALJ held prehearing conferences, public input sessions, site visits, and evidentiary hearings, and the parties served and submitted their respective written submissions.

#### 1. Evidence

Transource filed written direct, rebuttal, and rejoinder statements setting forth its experts' testimonies, as well as reports and studies, in support of its applications. Several of its witnesses were cross-examined at evidentiary hearings before the ALJ. Through this evidence, Transource sought to establish that the IEC Project satisfied the need requirements of the Code and the Regulations through PJM's cost-benefit analysis, which was approved by the Federal Energy Regulatory Commission (FERC), and is based on a 15-year projection of costs of a proposed project and annual benefits for the first 15 years of the Project's life. (Recommended Decision (R.D.), Findings of Fact (FOF) ¶¶ 39, 41, 66.)[9] Multiple re-evaluations continued to show that the IEC Project met PJM's cost-benefit analysis, thereby reflecting that it

---

[7] Initially, the matter was assigned to two ALJs, but the second ALJ no longer participated after March 1, 2020.

[8] The Office of Small Business Advocate (OSBA) and various affected landowners and entities were also granted intervenor status. (Op. and Order at 7-8.)

[9] The Recommended Decision is located at volume 5 pages 4768a through 4901a of the Reproduced Record.

continued to meet that standard. (R.D. at 66-67.) Transource offered former Commission Chairman James Cawley's testimony that no group is entitled to the artificially lowered costs that result from market congestion and that considering the benefits of congestion would be unreasonable because it would perpetrate discriminatory rates. (*Id.* at 71-72.) Transource's witnesses further asserted that the IEC Project resolved congestion within the APSRI but was not intended to just address congestion there but also elsewhere in the region, including the AP South Area and "related constraints." (*Id.* at 72-73.)

Transource offered the testimony of PJM's vice president, Steven Herling, who stated that congestion and reliability issues are often related. (*Id.* at 67, 74.) It further presented evidence that, in November 2018, which was after OCA presented direct testimony on the Siting Applications, PJM ran a single generation deliverability study without the IEC Project. (FOF ¶¶ 83, 85.) That study revealed five potential NERC reliability violations that could occur in 2023, which were resolved by the IEC Project. (*Id.* ¶ 83, R.D. at 68.) Mr. Herling further testified that if the IEC Project is not constructed, PJM would have to find an alternative solution, and there was not enough time to address those reliability violations. (R.D. at 68-69.) Transource further argued that the IEC Project provided benefits to Pennsylvania beyond resolving market congestion and reliability issues, including providing Pennsylvania generators with better access to markets and participating in regional planning through PJM, as testified to by Mr. Cawley. (*Id.* at 71.)

Intervenors filed written statements, surrebuttal and supplemental surrebuttal statements with their experts' testimonies in opposition to the IEC Project. This evidence raised questions regarding the ongoing need for the IEC Project where Transource continued to rely on outdated data and the congestion in the APSRI did

not occur as predicted and, therefore, the identified purpose for the IEC Project was no longer valid. (R.D. at 75-76.) For example, while congestion costs in the APSRI in 2014 were approximately $468.8 million, in 2016 and 2017, those costs, respectively, were $16.8 million and $21.6 million, and, by 2019, congestion costs were $14.5 million. (FOF ¶¶ 51-52, 55.) Further, evidence showed that demand for the PJM Region in general has decreased and that congestion event hours on the APSRI has dropped considerably since 2015. (*Id.* ¶¶ 57-58.) OCA submitted evidence reflecting that there have been recommendations to reevaluate PJM's market efficiency process and that PJM's cost-benefit analysis did not consider any increased costs or negative consequences to ratepayers elsewhere in the PJM Region that are caused by constructing a market efficiency project. (*Id.* ¶¶ 45-46, 61-62, 117.) When such consequences were considered, the savings derived from the IEC Project, which was estimated to cost $500 million, would decrease wholesale power prices in some areas by approximately $845 million but would increase those prices in other areas by $812 million, resulting in a net benefit of only around $32 million over 15 years. (*Id.* ¶¶ 65, 110.)

OCA offered other evidence reflecting that the projected savings resulting from the IEC Project would not be born out when other factors, including changes in energy generation, were considered or under the additional simulations performed by PJM. (*Id.* ¶¶ 73-81, 89, 97-104.) Further, areas that once benefited from the IEC Project, both in Pennsylvania and elsewhere in the PJM Region, no longer benefited in PJM's most recent simulations. (*Id.* ¶¶ 102, 104, 107-08.) In Pennsylvania, the IEC Project would lower wholesale power prices in certain areas of Pennsylvania by about $60 million over the first 15 years of the IEC Project but would increase power

9

prices elsewhere in Pennsylvania by $429 million in the same period. (*Id.* ¶¶ 122, 124.)[10]

### 2. The Recommended Decision

On December 22, 2020, the ALJ issued the Recommended Decision, which recommended denying the Siting Applications, as well as Transource's other ancillary applications. The ALJ held that the threshold issue was whether Transource had demonstrated, by substantial evidence, that the IEC Project was needed. According to the ALJ, Transource had to establish "that the IEC Project is necessary to maintain adequate, efficient, safe, and reasonable service and facilities," pursuant to Section 1501 of the Code, and that there was a need for the HV transmission lines under Section 57.76(a) of the Regulations. (R.D. at 53.) Noting that the Commission's grant of the provisional CPC did not contain a predetermination of need and was narrowly tailored to the IEC Project, the ALJ explained that "Transource may not construct the IEC [P]roject unless it can show that the [P]roject is necessary or proper, and in conformity with the [R]egulations . . . , which govern transmission line siting" because an "unnecessary change constitutes inadequate service to the public." (*Id.* at 53-54, 60.)

The ALJ concluded that Transource had not shown need for the IEC Project as required by Section 57.76(a) of the Regulations and Section 1501 of the Code, and that PJM's determination of need for the IEC Project in 2014-2015 to remove congestion on the APSRI did not definitively establish "need" for purposes of Pennsylvania law. The ALJ noted the question of whether resolving "congestion,"

---

[10] Additional evidence was taken, and findings of fact made, related to the other factors under Section 57.76(a) of the Regulations, such as environmental impacts and reasonable alternatives.

10

alone, is sufficient to meet the need requirement under the Code and the Regulations had not yet been answered and that this Court in *Energy Conservation Council of Pennsylvania v. Public Utility Commission*, 995 A.2d 465 (Pa. Cmwlth. 2010), did not resolve the issue, determining that reliability issues within the PJM Region supported the finding of need without consideration of "congestion." (*Id.* at 82-83.)

In reviewing the evidence and arguments, the ALJ was persuaded by Intervenors' evidence that, even if there had been congestion on the APSRI in 2014-2015, it was no longer congested, and, therefore, did not support a need for the IEC Project. The ALJ accepted as persuasive evidence that Transource continued to rely on outdated data and on inaccurate projections to support an ongoing claim of need. (*Id.* at 83.) The ALJ determined that Transource had, throughout the majority of the proceedings, cited relieving congestion on the APSRI as the purpose of the IEC Project and only later raised the resolution of congestion in the AP South Area and potential NERC reliability violations as reasons for the IEC Project. (*Id.* at 83, 87-88.) Citing, among other things, the lateness of the assertion of these reasons, the lack of a full investigation into the reliability violations, the lack of details regarding the alleged new congestion, and the failure to include alternative bases to resolve the claimed projection in the calculation, the ALJ found the evidence was insufficient to support need. (*Id.* at 83-84, 86-93.) The ALJ determined that the benefits of the IEC Project had to be weighed against all the detrimental impacts, both economic and environmental, accepting the criticisms of PJM's cost-benefit analysis used, including by PJM's Independent Market Monitor. (*Id.* at 94-95, 97-101.) The ALJ concluded that, based on the credible evidence offered by Intervenors, the IEC Project would "not provide sufficient benefits to Pennsylvania or the PJM [R]egion as [a] whole," because there would only be a net benefit of $32.5 million to the PJM

11

Region over a 15-year period, particularly where it was designed to "address a congestion constraint that has diminished to very low levels since the [IEC] Project was selected." (*Id.* at 97-98, 101-02.)

As for Transource's arguments that PJM's determination of need would be binding due to this matter involving issues of interstate regional transmission subject to FERC oversight, the ALJ held that the Commission was obligated to make an independent determination based on Pennsylvania law. (*Id.* at 82, 86, 99-102.) The ALJ further observed that while FERC has exclusive jurisdiction over the interstate transmission of electric energy and wholesale electric process, that jurisdiction was limited to matters that are not subject to state regulation. (*Id.* at 85 (citing Section 824(a) of the Federal Power Act, 16 U.S.C. § 824(a)).) According to the ALJ, FERC recognized this limitation by stating that there is "longstanding state authority over certain matters that are relevant to transmission planning and expansion, such as matters relevant to siting, permitting, and construction" and that the FERC was in no way invoking "an exercise of authority over those specific substantive matters traditionally reserved to the states . . . ." (*Id.* (quoting *Transmission Planning and Cost Allocation by Transmission Owning & Operating Pub. Utils.*, 76 Fed. Reg. ¶¶ 49,842, 49,861 (Aug. 11, 2011) (FERC Order No. 1000)).) This means, according to the ALJ, that FERC Order No. 1000 was "not intended to dictate substantive outcomes" or to allow FERC to "determine what needs to be built, where it needs to be built, and who needs to build it." (*Id.* at 85 n.13 (quoting *S.C. Pub. Serv. Auth. v. Fed. Energy Reg. Comm'n*, 762 F.3d 41, 57-58 (D.C. Cir. 2014) (internal quotation marks and citation omitted)).)

For these reasons, the ALJ issued the Recommended Decision recommending that the Commission deny the Siting Applications and all ancillary matters based on

Transsource having failed to meet its burden of proving need for the IEC Project under the Code and the Regulations. The ALJ additionally recommended that a Rule to Show Cause be issued on why Transsource's provisional CPC should not be rescinded.

*D. Appeal to the Commission*

Petitioners filed eight Exceptions to the Recommended Decision, to which Intervenors filed Reply Exceptions. Relevant to the issues before us, Petitioners argued, in Exception 1, that the ALJ erred in concluding that Transsource did not carry its burden of persuasion to establish the need for the Siting Applications pursuant to Section 1501 of the Code and Section 57.76(a) of the Regulations. This Exception asserted three general challenges to the ALJ's decision: (1) the Commission lacked authority to make an independent determination of need pursuant to the Code and the Regulations separate from PJM's determination of need based on PJM's authority as a federal regional transmission planning authority; (2) the ALJ improperly weighed the evidence; and (3) the ALJ's analysis misapprehended the state and federal roles in the nature of and need for regional transmission planning. (Reproduced Record (R.R.) Volume (Vol.) 5 at 4935a-59a.) The Commission rejected each of these challenges and adopted and incorporated the ALJ's findings of fact and conclusions of law, unless expressly rejected or modified.

On the first challenge, the Commission rejected the notions that federal jurisdiction controlled and that it was bound to accept PJM's determinations on the question of need for state approval of the PJM-approved regional transmission project. It held that whether the Pennsylvania standards were satisfied fell under the Commission's jurisdiction and discretion under the Code, the Regulations, and precedent. (Op. and Order at 54-55.) According to the Commission, the standard

used for determining need by PJM does not necessarily meet the requirements established and weighed under Section 1501 of the Code, the Regulations, and precedent. (*Id.* at 54.) The Commission concluded that the ALJ considered FERC Order No. 1000 and "PJM's regional planning responsibilities, and weighed those considerations as part of, but not dispositive of, the weight of the evidence regarding 'need' under" Section 57.76(a) of the Regulations. (*Id.* at 55.) Citing the same language in FERC Order No. 1000 and *South Carolina Public Service Authority*, the Commission held that the PJM approval did "not guarantee approval for siting and construction of transmission lines within the borders of . . . Pennsylvania." (*Id.* at 56-58.)

The Commission explained that the determination of whether need is established is broad and includes considering numerous factors, including the facts before it and the potential impact of the project, and a weighing of all the evidence presented. (*Id.* at 56.) Part of this determination, the Commission held, was its discretion to consider all the economic and environmental impacts of a PJM-approved project, even if PJM did not consider those impacts as part of its analysis. (*Id.* at 58.) This included the negative impacts on ratepayers, both in Pennsylvania and elsewhere in the PJM Region, that resulted from resolving congestion due to the IEC Project. (*Id.* at 59.) Because the ALJ considered the regional planning impacts, as well as the impacts on Pennsylvania customers, the Commission rejected Petitioners' argument that the ALJ improperly took a Pennsylvania-only approach. (*Id.*) Noting the main purpose of the IEC Project was to resolve regional economic congestion that was predicted to substantially increase utility rates elsewhere, the Commission held its review of the project needed to examine the underlying data

14

and congestion trends to determine if the current data of those needs was more persuasive than the detrimental impact. (*Id.* at 60.)

Applying these conclusions, the Commission agreed with the weight the ALJ gave to the evidence. The Commission agreed that Intervenors' arguments that the data congestion relied upon by PJM to approve the IEC Project, which was tied to the APSRI, was not reliable enough to meet Pennsylvania's standard for need where that data reflected substantial fluctuation and, ultimately, decline in congestion in that area. (*Id.*) The Commission further cited Transource's shifting bases for the need of the IEC Project, from originally relieving congestion in the APSRI, then to the potential reliability violations, and finally the resolution of other congestion on "related constraints" in the AP South Area, which the Commission did not dismiss outright as "new reasons," but found reflected the nature and the scope of the IEC Project. (*Id.* at 61.) Nonetheless, the Commission "agree[d] with the ALJ[] that the relative weight of the evidence of the later-asserted bas[e]s for need for the project diminishe[d] as it [became] more tangential to the unambiguous original driver of" the IEC Project, which was the "alleviation of economic congestion on the AP[SRI]." (*Id.* at 62.) Finally, the Commission explained it was not persuaded by Petitioners' challenges to the ALJ's acceptance of Intervenors' evidence criticizing Transource's evidence and PJM's analysis as credible and persuasive. (*Id.*)

For these reasons, the Commission concluded:

Therefore, based upon the broad powers conferred upon [it], we find that the ALJ properly construed the state versus federal roles regarding transmission planning in the analysis and application of the relevant statutory authority, applicable regulations and case law to the present case. Accordingly, we shall reject [Petitioners'] arguments to the contrary.

15

Based upon our review of the record in this proceeding, the relative weight of the evidence presented, and the arguments of the [p]arties, we conclude that in the present circumstances Transource fail[ed] to carry the burden of persuasion by a preponderance of the evidence to establish need for the proposed [S]iting Applications, pursuant to our authority under Section 1501 of the Code and [Section 57.76(a)(1) of the] . . . Regulations, 52 Pa. Code [§] 57.76(a)(1). Because we have concluded that the evidence is insufficient to establish the required element of "need" under [Section 57.76(a)(1) of the Regulations,] the arguments related to the other required elements under [Section 57.76(a)(2)-(4)] are rendered moot and shall not be addressed.

(Op. and Order at 63-64.)

In addition, the Commission denied Petitioners' Exception No. 5, which challenged the ALJ's recommendation relating to the rescission of Transource's provisional CPC. The Commission concluded that the grant of the provisional CPC was related specifically to the IEC Project and specifically deferred the statutory determination of need to a future proceeding. (*Id.* at 70.) Having found that Transource had not established need, a statutory requirement for retaining the provisional CPC, and the denial of the Siting Applications, the Commission held that "the provisional need for which Transource's CPC was issued will cease to exist." (*Id.* at 71.) Acting within its statutory authority and discretion, the Commission concluded that "the failure to establish necessity of the service for which the provisional CPC was issued . . . constitutes 'cause' to rescind the provisional CPC." (*Id.*) The Commission further denied Petitioners' Exception that asserted that the ALJ issued "faulty findings," reasoning that the Exception was insufficiently specific, the "[f]actual [f]indings and [c]onclusions of [l]aw were based upon a careful review of the extensive and complex evidence presented in this proceeding," and the Exception was simply a general disagreement with those

16

findings and conclusions.  (*Id.* at 73-74.) The Commission denied all of the remaining Exceptions except one as moot.[11]  (*Id.* at 64-66, 72.)

Petitioners now petition for review of the Commission's Opinion and Order.[12]

---

[11] The Commission granted Petitioners' Exception No. 4, concluding that the challenged finding of fact appeared to improperly treat lay witness testimony as expert witness testimony and striking that finding of fact.  (Op. and Order at 65-66.)

[12] In addition to filing a Petition for Review in this Court, Transource filed a suit against the Commission in the United States District Court for the Middle District of Pennsylvania (District Court), *Transource Pennsylvania, LLC v. Dutrieuille*, Docket No. 21-cv-1101, asserting that the Commission violated the Supremacy and Dormant Commerce Clauses of the United States Constitution.  Petitioners included, in their Petition for Review, a reservation of the right to pursue those federal claims in federal court pursuant to *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411 (1964) (*England* Reservation). This reservation was reiterated in Petitioners' main brief and reply brief, and Petitioners have not provided any direct argument regarding the federal constitutional claims.  Rather, they assert that the issue before this Court is whether the Commission "erred in applying state law when denying the [IEC] Project," which is distinct from its federal claims that the Commission lacked the legal authority to reject PJM's determinations under federal law.  (Petitioners' Reply Brief (Br.) at 29.)  The Commission and Franklin County argue that Petitioners have impliedly placed the federal issues before this Court in this appeal by arguing that the Commission had to accept PJM's determinations, and, as such, we should address them.

Under the *England* doctrine, a litigant is required to advise state courts of its federal claims "so that the state statute may be construed 'in light of' those claims," *England*, 375 U.S. at 419-21, and involves "a federal court abstain[ing] from deciding a federal constitutional issue to enable the state courts to address an antecedent state-law issue," *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 339 (2005).  On August 26, 2021, the District Court denied a challenge to its subject matter jurisdiction based on an allegation that Transource lacked standing and, over Transource's objection, abstained from considering the remainder of the motion to dismiss. *Transource Pa., LLC*, (M.D. Pa. Aug. 26, 2021), 2021 WL 3784284, at *3-4, 10-12.  In doing so, the District Court noted, in part:  resolution of the federal claims would not resolve the state[]law claims at issue in the Commonwealth Court; while Transource had asserted an *England* Reservation and maintained the federal claims would not be before the Commonwealth Court, it also represented that it may "protectively brief" the federal claims in that matter; and the issues in both matters, while distinctly worded, were substantially similar.  Based on Transource's representation that it **may** protectively brief the federal claims in this Court, the District Court reasoned that abstention was appropriate as there was "a distinct possibility that both courts may essentially be asked to resolve the same issues," and, therefore, "the same issues have at least been **presented** before both courts." *Id.* at *10-11 (emphasis in original).
**(Footnote continued on next page…)**

17

## II. DISCUSSION

### A. Relevant Legal Principles

Our review of the Commission's Opinion and Order is guided by the following legal principles. "Appellate review of a [Commission] order is limited to determining whether a constitutional violation, an error of law, or a violation of [Commission] procedure has occurred and whether necessary findings of fact are supported by substantial evidence." *Popowsky v. Pa. Pub. Util. Comm'n*, 910 A.2d 38, 48 (Pa. 2006) (*Popowsky II*). Where an agency action involves the exercise of discretion, we will not find an abuse of that discretion in the absence of bad faith, fraud, capricious actions, or an abuse of power. *Slawek v. State Bd. of Med. Educ. & Licensure*, 586 A.2d 362, 365 (Pa. 1991). Pursuant to Section 332(a) of the Code, 66 Pa.C.S. § 332(a), the proponent of the order in a proceeding before the Commission bears the burden of proof and must prove its case by a preponderance of the evidence, which is evidence more convincing than that offered by the other parties. *Se-Ling Hosiery, Inc. v. Marguilies*, 70 A.2d 854, 855-56 (Pa. 1950); *Samuel J. Lansberry, Inc. v. Pa. Pub. Util. Comm'n*, 578 A.2d 600, 602 (Pa. Cmwlth. 1990). The burden of proof contains two distinct burdens, the burden of production and the burden of persuasion. *Riedel v. Cnty. of Allegheny*, 633 A.2d 1325, 1328 n.11 (Pa. Cmwlth. 1993). "[T]he burden of persuasion never leaves the party on

---

Reviewing the issues presented and argued by Petitioners, which do **not** include any "protective[] briefing" of the federal claims, *id.*, the issues before this Court relate to whether the Commission's decision is consistent with Pennsylvania law and is supported by substantial evidence, also a matter of Pennsylvania law. We read Petitioners' arguments regarding the Commission's consideration of the PJM determinations as relating to substantial evidence, rather than relating to federal preemption. Accordingly, we will **not** address the federal claims that Transource has reserved for consideration in the District Court and focus instead on whether the Commission's decision is correct under Pennsylvania law.

18

whom it is originally cast, but the burden of production may shift during the course of the proceedings." *Id.*

Here, Petitioners argue that Transource met its burden of proof on the IEC Project and that the Commission erred in interpreting Section 1501 of the Code and Section 57.76(a) of the Regulations to conclude otherwise. They further argue that the Commission's findings necessary to support its conclusion that the IEC Project does not meet the standard for approval under Pennsylvania law are not supported by substantial evidence. Finally, Petitioners argue that the Commission erred in rescinding the provisional CPC and not addressing the merits of the remaining Exceptions.[13] We address these arguments in turn.

## B. *Section 1501 of the Code and Section 57.76(a) of the Regulations*

### 1. Parties' Arguments

Petitioners argue that the Commission erred as a matter of law in interpreting Section 1501 of the Code as requiring the IEC Project to be both necessary **and** proper when that provision requires a proposed facility to be necessary **or** proper for the service of the public. The Commission further erred in interpreting Section 57.76(a) of the Regulations as requiring Transource to prove that the IEC Project was "reasonable and necessary and in the public interest," which is inconsistent with Section 1501's recognition that a service may be approved if it is proper. (Petitioners' Brief (Br.) at 18 (quoting Op. and Order at 56).) Petitioners argue that "proper" means something that is "appropriate to the purpose or circumstance; fit; suitable." (*Id.* at 19-20 (citing *PPL Elec. Utils. Corp. v. Pub. Util. Comm'n* (Pa. Cmwlth., No. 624 C.D. 2019, filed Oct. 27, 2020), slip op. at 24) (quotation

---

[13] Although Petitioners set forth eight separate arguments in their brief, those arguments have been consolidated into these three main arguments.

omitted).)[14] Petitioners assert that the IEC Project is a proper means of resolving market congestion and the potential NERC violations, the latter of which relate to the provision of safe and reasonable service. According to Petitioners, had the Commission applied the correct standard, that is, considered whether the IEC Project was "proper for the accommodation, convenience, and safety of . . . the public," the Siting Applications would have been granted. (*Id.* at 19-20.)

Petitioners further argue that the Commission erred in focusing solely on the potential impact to Pennsylvania rates, rather than considering the mitigation of regional market congestion, in concluding that there was no need for the IEC Project. That prices may increase for Pennsylvania ratepayers due to the resolution of congestion and market inefficiencies is not, per Mr. Cawley, a "cost" that should be considered in ascertaining whether a project is proper or needed under, respectively, Section 1501 of the Code and Section 57.76(a) of the Regulations. (Petitioners' Br. at 41-42.) Citing Section 2805(a) of the Code, Petitioners assert the Commission is required to consider regional concerns and to work with PJM to support and enhance regional transmission planning, from which Pennsylvania benefits. In focusing on local rates in a matter involving a project related to resolving wholesale impacts to the PJM Region, Petitioners maintain that the Commission did not comply with its obligation to support regional transmission planning as required by Section 2805(a).

The Commission responds that it properly interpreted and applied Section 1501 of the Code and Section 57.76(a) of the Regulations in reviewing whether the IEC Project met the standards for approval under Pennsylvania law. It considered

---

[14] *PPL Electric Utilities* is an unreported opinion which, while not binding, may be cited for its persuasiveness pursuant to Pennsylvania Rule of Appellate Procedure 126(b), Pa.R.A.P. 126(b), and Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

whether the IEC Project was necessary or proper and if it was needed and, based on its evidentiary weight determinations, found that the IEC Project was not. To the extent that Petitioners maintain all that was required to be proven was that the IEC Project was proper under Section 1501 of the Code, Transource did not make this argument before it or the ALJ and, therefore, any such claim has been waived. Even if not waived, the Commission contends that the propriety of a project is not so broad as Petitioners assert, as a project should be "suitable" and "fitting," and substantial evidence supports that the IEC Project is not suitable or fitting for its purported purpose. (Commission's Br. at 42 (quoting Merriam-Webster Thesaurus, available at https://www.merriam-webster.com/thesaurus/proper (last visited May 4, 2022)).)

The Commission also argues that necessity for proposed transmission lines may be found when such lines provide lower prices or improved reliability, *Hess v. Pennsylvania Public Utility Commission*, 107 A.3d 246, 260 (Pa. Cmwlth. 2014), and, here, the Commission was not persuaded by the evidence offered to establish that the IEC Project was necessary or proper. That PJM determined that there was a need for the IEC Project under its standards, while relevant, is not determinative of the approval of siting applications under the Code and the Regulations, which is an independent decision that belongs to the Commission. The Commission disputes that it relied only on the impacts to Pennsylvania rates in determining the lack of need for the IEC Project, pointing to findings relating to the overall regional costs and benefits, which likewise support its decision that the IEC Project was not needed, necessary, or proper.

OCA argues the Commission applied the correct legal standard in determining whether Transource met its burden of proof under Section 1501 of the Code and Section 57.76(a) of the Regulations. OCA maintains that despite Petitioners'

21

argument that "proper" is distinct from "need," Petitioners still connect the two by arguing that if a project is proper, it must be needed. (OCA's Br. at 11 (citing Petitioners' Br. at 17).) Accepting Petitioners' broad interpretation of "proper" would allow any utility plan that is functional to be approved irrespective of the consequences to the environment, consumers, or the market. Even applying a proper-only standard, OCA asserts, Petitioners did not meet that standard because the identified need for the IEC Project, resolving congestion in the APSRI, is no longer present. As for Petitioners' argument that the standard under Section 57.76(a), as interpreted by the Commission, conflicts with Section 1501, they made no such arguments to the Commission in the Exceptions and, even if raised, the two provisions have distinct purposes – one standard applies distinctly to HV transmission lines and the other to public utilities in general. OCA contends that the Commission did not ignore the importance of regional transmission needs, it considered those needs, as required by Section 2805(a) of the Code, but correctly concluded the evidence relating to the various reasons proffered by Transource did not establish the need for the IEC Project under Pennsylvania law, which is a determination independent of PJM's determination of need. The Commission's review was not limited to the impacts in Pennsylvania, OCA argues; rather, it examined the impacts throughout the PJM Region, much of which would see increases in their energy prices as a result of the IEC Project.

Franklin County argues Petitioners waived the issue that Transource only had to establish that the IEC Project was proper because it was not raised before the ALJ or the Commission. Since the grant of the provisional CPC, the issue to be addressed was whether there was a need for the IEC Project under Pennsylvania law, which Transource attempted to prove during the ALJ proceedings without arguing that it

22

only had to prove that the IEC Project was proper. Even if not waived, Franklin County asserts, the Commission applied the correct standards, reviewing the IEC Project under the specific standards of Section 57.76(a)(1) of the Regulations, which must take into consideration the environmental and safety concerns of HV transmission lines pursuant to article I, section 27 of the Pennsylvania Constitution (Environmental Rights Amendment),[15] and the general standards of Section 1501 of the Code. Franklin County argues the Commission did not err in considering PJM's determination of need but not finding such need sufficient for purposes of Pennsylvania law. Contrary to Petitioners' argument, the Commission did not rely on Pennsylvania impacts, but examined the needs and congestion of the PJM Region, which is consistent with the Commission's obligations under Section 2805(a) of the Code. Based on the evidence presented and credited, Franklin County maintains the Commission properly concluded that the IEC Project was not necessary "to ensure the continued provision of adequate, safe and reliable service to the citizens and businesses in" Pennsylvania, or in the entire PJM Region. (Franklin County's Br. at 24 (quoting 66 Pa.C.S. § 2805(a)) (emphasis omitted) (internal quotations omitted).)

STFC argues the Commission committed no error of law or abuse of discretion in interpreting Section 1501 of the Code and applied the "necessary or proper" standard in exercising its independent authority to analyze the Siting

---

[15] Article I, section 27 of the Pennsylvania Constitution states:

> The people have a right to clean air, pure water and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

PA. CONST. art. I, § 27.

23

Applications. As to the argument that Transource only had to prove that the IEC Project was proper, STFC asserts that this standard, in the context of transmission line siting, is not an alternative, lesser standard that would allow construction of any transmission line proposed – such line still must be appropriate to the purpose or circumstance, which the IEC Project is not. According to STFC, Section 57.76(a) of the Regulations, which requires denial of siting applications unless need for the proposed HV transmission lines is shown, is not unreasonable or beyond the Code's grant of authority, particularly where the Commission has recognized that such lines "cannot be constructed without some adverse effect upon the environment," and implicates the Commission's obligations under the Environmental Rights Amendment. (STFC's Br. at 22 (citing *In Re Proposed Elec. Reg.*, 49 Pa. P.U.C. 709, 712, 1976 Pa. PUC LEXIS 114 (1976)).) That a regulation is burdensome does not make its application or interpretation an abuse of discretion, but rather to be invalid, "what has been ordered must appear to be so entirely at odds with fundamental principles . . . as to be the expression of a whim rather than an exercise of judgment." (*Id.* at 18 (citing *Pa. Hum. Rels. Comm'n v. Uniontown Area Sch. Dist.*, 313 A.2d 156, 169 (Pa. 1973)).)

In their reply brief, Petitioners assert that necessary and proper are distinct standards, as recognized by this Court in *PPL Electric Utilities*, and that this Court has recognized that "necessity" is present "whenever the project result[s] in a benefit to the public, such as an improvement to the reliability of service or lower prices," which Transource established would happen through the construction of the IEC Project. (Petitioners' Reply Br. at 8 (quoting *Hess*, 107 A.3d at 260).) According to Petitioners, they did not waive the right to argue that the IEC Project is proper and that applying Section 57.76(a) as requiring need beyond the necessary or proper

24

standard conflicts with Section 1501 of the Code because such arguments are encompassed in their original argument that the IEC Project should be approved because it meets the Section 1501 standards. Petitioners point to their brief to the Commission that the IEC Project "is clearly needed and is necessary or proper for the accommodation, convenience and safety of its patrons, employees and the public," as encompassing its current arguments before the Court. (Petitioners' Reply Br. at 10 (quoting R.R. Vol. 5 at 4045a).) Further, they assert they could not know that the Commission would misinterpret Section 57.76(a) before it issued the Opinion and Order and, therefore, its current arguments could not have been raised earlier.

## 2. Analysis

Section 1501 of the Code addresses, **generally**, the character of services and facilities of a public utility and provides, in relevant part:

> **Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities,** and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities **as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public**. . . . Such service and facilities shall be in conformity with the regulations and orders of the [C]ommission.

66 Pa.C.S. § 1501 (emphasis added). Our Supreme Court has recognized that the word "or" in "necessary or proper" "must be given its ordinarily disjunctive meaning unless such a construction would lead to an absurd result." *Elite Indus., Inc. v. Pa. Pub. Util. Comm'n*, 832 A.2d 428, 431 (Pa. 2003). While *Elite Industries* involved Section 1103(a) of the Code, which relates to the grant of a CPC, both that section

25

and Section 1501 use the phrase "necessary or proper." *Compare* 66 Pa.C.S. § 1103(a), *with* 66 Pa.C.S. § 1501.

Section 57.76(a)(1) of the Regulations relates specifically to the siting and construction of HV lines and states:

> (b) The Commission will issue its order, with its opinion, if any, either granting or denying the application, in whole or in part, as filed or upon the terms, conditions or modifications, of the location, construction, operation or maintenance of the line as the Commission may deem appropriate. **The Commission will not grant the application**, either as proposed or as modified, **unless it finds and determines as to the proposed HV line**:
>
> (1) That there is a **need** for it.

52 Pa. Code § 57.76(a)(1). Pursuant to Section 57.75(e)(1) of the Regulations, in reviewing siting applications, the Commission must accept evidence of, among other things, the "present and future **necessity** of the proposed HV line in furnishing service to the public." 52 Pa. Code § 57.75(e)(1) (emphasis added). When the Commission promulgated these regulations, it recognized that HV transmission lines could not "be constructed without some adverse effect upon the environment," and, therefore, its review must incorporate the requirements of the Environmental Rights Amendment. *In Re Proposed Elec. Reg.*, 49 Pa. P.U.C. at 712.

Finally, Section 2805(a) of the Code provides that

> [t]he [C]ommission shall take all necessary and appropriate steps to encourage interstate power pools to enhance competition and to complement industry restructuring on a regional basis. The Commonwealth, the [C]ommission and Pennsylvania electric utilities shall work with the Federal Government, other states in the region and interstate power pools to accomplish the goals of restructuring and to establish independent system operators or their functional equivalents to operate the transmission system and interstate power pools. The [C]ommission, Pennsylvania electric utilities and all electricity

26

suppliers shall work with the Federal Government, other states in the region, the . . . [NERC] and its regional coordinating councils or their successors, interstate power pools, and with the independent system operator or its functional equivalent to ensure the continued provision of adequate, safe and reliable electric service to the citizens and businesses of this Commonwealth.

66 Pa.C.S. § 2805(a).

This matter involves the interpretation of these provisions, and the Commission's "interpretations of the Code, the statute for which it has enforcement responsibility, and its own regulations are entitled to great deference and should not be reversed unless clearly erroneous." *Lehigh Valley Transp. Servs. v. Pa. Pub. Util. Comm'n*, 56 A.3d 49, 56 (Pa. Cmwlth. 2012) (quoting *Energy Conservation Council*, 995 A.2d at 478). "The statutory and regulatory scheme regarding the approval of the siting and construction of transmission lines is technically complex, and a reviewing court should put aside its discretion in favor of the Commission's expertise." *Hess*, 107 A.3d at 259. Thus, a Commission determination that facilities are "necessary or proper for the service, accommodation, convenience or safety of the public" is entitled to "strong deference" and "given controlling weight unless it is clearly erroneous." *Riverwalk Casino, L.P. v. Pa. Gaming Control Bd.*, 926 A.2d 926, 940 (Pa. 2007).

Reviewing the Commission's Opinion and Order with these principles in mind, we discern no clear error in the determination that Transource did not meet its burden of proof under Section 1501 of the Code and Section 57.76(a) of the Regulations on the Siting Applications. First, we agree with the Commission that the determination of whether a utility meets the requisite burden of proof under **Pennsylvania** law is an independent one. The Commission's role is to regulate utilities for the purposes of Pennsylvania law and to determine if the proposed

27

services and facilities comport with Pennsylvania law. That is what it did here; it examined the Siting Applications, the evidence offered in support of and opposition to those applications, and made a determination as to whether Transource met its burden of proof on those Siting Applications under Pennsylvania law. The need for the Commission's independent review is particularly true where Pennsylvania law sets forth different requirements and considerations for approving HV transmission lines than may be addressed in PJM's proceedings.

Next, examining the Opinion and Order in its entirety, the Commission did not deviate from the "necessary or proper" standard set forth in Section 1501 of the Code or interpret Section 57.76(a) of the Regulations in a way that is inconsistent with that standard. While there may be places where the Opinion used "necessary and proper," rather than "necessary or proper," the Commission recognized the statutory standard and applied it, as well as the regulatory standard of "need" as set forth in Section 57.76(a), to the evidence presented. After doing so, the Commission concluded that Transource had not met its burden of proving those standards based on the evidence it presented, which was found to be less persuasive than the evidence in opposition to the IEC Project.

Necessity and need are corollaries, and this Court has explained that, for purposes of HV transmission lines, necessity can be established by showing an improvement in the reliability of services or lower prices. *Hess*, 107 A.3d at 260. As for any lower prices that could result from the IEC Project, the Commission considered all the costs and benefits of the IEC Project, not just those considered by PJM, and, because there were considerable increases in prices to ratepayers in both Pennsylvania and elsewhere in the PJM Region, found that this did not support the grant of the Siting Applications. As for the potential NERC reliability violations,

28

the Commission, as factfinder, found that the relative weight to this later-asserted basis for the IEC Project had diminished because, among other reasons, "it bec[a]me more tangential to the unambiguous original driver of the" IEC Project. (Op. and Order at 62.) As for the resolution of congestion in the APSRI, it does not appear that we have ever held that congestion, which is an economic consideration, is sufficient on its own to support need or necessity under Pennsylvania law. In *Energy Conservation Council*, we observed that while there was a challenge to the Commission's reliance on congestion to find need, we did not address that challenge, stating that "even if the [Commission] erred in considering congestion issues," the finding of public need in that case was supported on reliability grounds. 995 A.2d at 487. Similar to that case, we need not decide this issue here because the congestion in the APSRI decreased significantly over the years and, therefore, was rejected as being a valid basis for the IEC Project. To the extent that Transource later asserted that the IEC Project would resolve congestion in the AP South Area and related constraints, like the potential NERC reliability violations, that reason was not given much weight for a variety of reasons. Thus, based on the evidentiary findings of the Commission, we discern no clear error in the Commission's determination that Petitioners did not satisfy the standards under Section 1501 of the Code and Section 57.76(a) of the Regulations.

Alternatively, Petitioners argue that the Siting Applications should have been granted because the IEC Project was proper, that is, "being adapted or appropriate to the purpose or circumstances; fit; suitable," for its purpose. *PPL Elec. Utils.*, slip op. at 24 (quotation and citation omitted). The Commission argues that, if the issue is not waived, it addressed the propriety of the IEC Project, finding that the costs outweighed the limited benefits, and, moreover, that the proper standard is not as

29

broad as Petitioners claim, which requires that a project be "suitable," or "acceptable." (Commission's Br. at 42.) We agree that Petitioners' broad interpretation of "proper" goes beyond what is intended by Section 1501 of the Code.

The application of the "proper" standard is dependent on the circumstances of each case. For example, the Supreme Court determined in *Elite Industries* that "necessary or proper" must be given its disjunctive meaning and that using a less stringent standard to obtain a CPC was appropriate in that case. This reasoning was based, at least in part, on the facts that the applicant sought to offer a private limousine service, the applicant "would be hard pressed to show a 'public need' for convenience," and approval of the CPC would allow for growth and competition within the industry. 832 A.2d at 432. The Supreme Court explained that, in requiring a showing of public need, this Court had infringed upon the Commission's broad discretion within which the General Assembly left the determinations regarding the propriety of granting a CPC. *Id.* Similarly, in *PPL Electric Utilities*, slip op. at 22-24, which involved a utility's internal corporate restructuring, this Court recognized that "it would be very difficult, if not impossible, for [a u]tility to establish an affirmative and substantial benefit to the public," and that this was a case in which "the Commission **c[ould] conduct** a disjunctive analysis," **and then remanded the matter to the Commission to determine if the restructuring was proper**. (Emphasis added.) Thus, in these cases, the disjunctive "proper" standard was used primarily because it was unlikely that the public need, i.e., necessity, standard could ever be met based on the type of service or action that was being proposed and was to be determined to apply based on the circumstances involved. From these cases, we discern that while the Commission is to determine whether a service or facility is "necessary **or** proper," 66 Pa.C.S. § 1501 (emphasis added), that

30

determination should consider the circumstances, such as the type of service or action being proposed, and that this determination falls within the Commission's sound discretion.

Unlike the situations in *Elite Industries* and *PPL Electric Utilities*, it cannot reasonably be said that it is unlikely or nearly impossible to establish a public need for an HV transmission line – the Commission and this Court have addressed numerous such applications and findings of public need have been made which support approving those lines. *See Hess*, 107 A.3d at 250, 257-58, 260-61; *Energy Conservation Council*, 995 A.2d at 486-87; *In Re: Application of Trans-Allegheny Interstate Line Co. (TrAILCo)*, 103 Pa. P.U.C. 554, 2008 WL 5786507 (Pa. PUC Dec. 12, 2008), slip op. 10-12, 16-18; *Application of PP&L Elec. Utils. Corp.*, 2010 WL 637064 (Pa. PUC Feb. 12, 2010) (*Susquehanna-Roseland*), slip op. at 9, 14, 30. Thus, the broad application of the "proper" standard asserted by Petitioners is not as warranted here as it had been in *Elite Industries* and *PPL Electric Utilities*. Further, we must remain cognizant that the standards for siting HV transmission lines must be read in the context of the Environmental Rights Amendment, with which the Commission's Regulations were promulgated to be consistent. Here, the Commission reviewed the evidence presented and concluded that the proffered reasons for the IEC Project, including the later-asserted alleged resolution of congestion outside the APSRI and the possible NERC reliability violations, when weighed against the detriments of the IEC Project, did not meet the standard under Section 1501, which necessarily includes whether such facility was "proper." As this determination is within the Commission's expertise and discretion, and because that determination is not clearly erroneous, we will not infringe on that discretion.

Finally, the Commission did not violate its obligations under Section 2805(a) of the Code to work with regional transmission planning groups and the Federal Government when it denied the Siting Applications and rescinded Transource's provisional CPC under Pennsylvania law. The Commission recognized the asserted regional planning goals of the IEC Project but found, after weighing the evidence, that the evidence offered to support that the IEC Project satisfied the Pennsylvania standards for approval was not persuasive for a variety of reasons. Further, and contrary to Petitioners' arguments, the Commission did not engage in a Pennsylvania-only review of the costs and benefits of the IEC Project. While evidence of the detrimental impact to Pennsylvania ratepayers was cited and considered as part of the conclusion that Transource did not meet its burden of proof, the Commission also examined the detrimental impacts to ratepayers in other parts of the PJM Region in reaching that conclusion. Accordingly, this is not a reason to find that the Commission's determination was clearly erroneous.

### C. Evidentiary Claims

#### 1. Parties' Arguments

Petitioners argue the Commission made several errors in reviewing and rejecting Transource's evidence in this matter. First, Petitioners argue the Commission erred in rejecting PJM's determination of the need for the IEC Project, which was presented as evidence to establish need under the Code and the Regulations, despite PJM's expertise in the area of transmission planning, including the management and mitigation of chronic congestion within the PJM Region. Petitioners maintain that the Commission should have relied on that evidence because PJM's process was approved by FERC, was supported by numerous studies,

and had been accepted by the Commission and this Court in the past, including in *Energy Conservation Council*, 995 A.2d 465, to support granting siting applications.

Second, Petitioners assert the Commission's finding that the IEC Project is not necessary to resolve congestion or the potential NERC violations is not supported by substantial evidence because the evidence relied upon, that of the opposing parties, constituted "a vast oversimplification of the complex electrical engineering analysis required to evaluate congestion on the interstate transmission system." (Petitioners' Br. at 29.) Petitioners contend that only Transource presented evidence of actual studies or modeling showing that the IEC Project was needed to resolve congestion in the AP South Area and to resolve the NERC reliability issues, which the Commission abused its discretion in disregarding. According to Petitioners, the opposing parties' witnesses had less experience than Transource's experts and their evidence regarding the IEC Project no longer being needed due to reduced congestion on the APSRI was speculative, particularly where the IEC Project was not limited to resolving congestion on that particular interface. Petitioners further assert that no opposing party offered substantive or empirical data regarding the pending NERC reliability violations. Petitioners maintain that the Commission improperly relied on speculation that other upgrades may resolve those violations and the lack of additional testing to reject PJM's findings in this regard despite there being no reason for PJM to run additional testing because the IEC Project, a baseline upgrade, would resolve the potential reliability violations in a timely fashion.

The Commission responds that its findings that the IEC Project did not meet the standard for approval under Pennsylvania law are supported by substantial evidence. According to the Commission, its rejection of PJM's need determination

33

was based on credible evidence reflecting that PJM's cost-benefit analysis was flawed and did not consider costs to other parts of the PJM Region, that the congestion in the APSRI had decreased since the initial study that supported PJM's need determination, and that there was insufficient proof of the potential NERC reliability violations. It maintains that there was substantial evidence to support each of these determinations, including that the net benefit would only be $32.5 million over a 15-year period, that the data relied upon to continue supporting the need for the IEC Project became outdated, and that the congestion cited as the purpose for the IEP Project was no longer an issue. As for the alleged potential NERC reliability violations, the Commission asserts the reasons offered for giving less weight to that evidence were supported by the record and reasonable. The Commission contends that Petitioners' arguments to the contrary are simply a request for this Court to reweigh the evidence, which is beyond this Court's appellate role.

OCA likewise argues that there was no error or abuse of discretion by the Commission in not relying on PJM's determination and that PJM's process is inherently unfair in ascertaining whether the benefits of a market efficiency project outweigh its costs. OCA maintains that the Commission considered and weighed all of the evidence in its role as factfinder, that Petitioners' arguments are impermissible attacks on the evidentiary determinations, and that the fact that Transource presented evidence that supports other findings of fact is of no moment because the findings made are supported by substantial evidence. According to OCA, while the Commission has relied on PJM determinations in the past, it did so merely as evidence to be considered and not as the sole reason for granting relief.

Franklin County argues that the Commission's findings regarding the lack of need for the IEC Project are supported by substantial evidence, including by

Transource's own data, and that the evidence related to Transource's later-asserted reasons for the IEC Project was properly rejected as being insufficient after being weighed by the Commission. There was no impropriety, according to Franklin County, for the Commission to make its own determination as to the reliability of PJM's projections based on the evidence presented or to accept evidence opposing the IEC Project as more persuasive. To the extent that the Commission has cited PJM data and witnesses in the past, it was as part of the Commission's own analysis and not merely accepting PJM's determination as establishing need.

STFC argues that the findings of fact are supported by substantial evidence, Petitioners seek to have this Court reweigh the evidence by claiming only Transource presented substantial evidence, and the Commission is not bound by PJM's determination of need for the IEC Project for purposes of Pennsylvania law. STFC maintains that the Commission has not historically relied solely on PJM's determinations to establish need under Pennsylvania law but considered such determinations as evidence. STFC further argues that the Commission has not held that PJM-identified congestion and economic issues were sufficient, in themselves, to support a finding of need under Pennsylvania law.

Petitioners respond, reemphasizing their arguments that the Commission's findings as to the lack of need, congestion, and reliability violations are not supported by substantial evidence, pointing to Transource's own evidence in support. Petitioners reassert that the Commission has accepted PJM determinations of need as being sufficient to meet the standard for granting siting applications under Pennsylvania law and it should have done so here. PJM's determinations that the IEC Project is needed to relieve congestion and resolve the potential NERC reliability violations constitute substantial evidence to support that the project is both

35

necessary and proper and were improperly rejected by the Commission. Petitioners claim that they are not asking this Court to reweigh the evidence but to reverse the finding that the IEC Project did not meet the standard for approval under Pennsylvania law because it is not supported by substantial evidence, as the opposing parties' evidence was fully rebutted by Transource's evidence. (Petitioners' Reply Br. at 26.)

2. Analysis

It is well settled that the Commission "is the ultimate factfinder[] and makes all decisions as to the weight and credibility of evidence." *Borough of Duncannon v. Pa. Pub. Util. Comm'n*, 713 A.2d 737, 739 (Pa. Cmwlth. 1998). For a Commission finding to be supported by substantial evidence, which is "the amount of relevant evidence which a reasonable person would accept as adequate to support a determination," *Popowsky v. Pennsylvania Public Utility Commission*, 937 A.2d 1040, 1054 (Pa. 2007) (*Popowsky III*), there must be "more than a mere trace of evidence or suspicion of the existence of a fact sought to be established," *HIKO Energy, LLC v. Pennsylvania Public Utility Commission*, 163 A.3d 1079, 1094 (Pa. Cmwlth. 2017) (quoting *Lyft, Inc. v. Pennsylvania Public Utility Commission*, 145 A.3d 1235, 1240 (Pa. Cmwlth. 2016)), *aff'd*, 209 A.3d 246 (Pa. 2019). Additionally, the record evidence, as well as the inferences that can be logically drawn from that evidence, must be "viewed in a light most favorable to" "[t]he party who [sic] prevailed before the" Commission. *United Transp. Union v. Pa. Pub. Util. Comm'n*, 68 A.3d 1026, 1032 (Pa. Cmwlth. 2013). It is irrelevant if "the record may contain evidence that supports a different result than that reached by the [Commission] . . . so long as the record contains substantial evidence supporting the [Commission's]

decision." *Lyft, Inc.*, 145 A.3d at 1240. This Court should not "'substitute its judgment for that of the [Commission] when substantial evidence supports the [Commission]'s decision on a matter within the [C]ommission's expertise,' nor should it indulge in the process of weighing evidence and resolving conflicting testimony." *Energy Conservation Council*, 995 A.2d at 478 (citing *Popowsky v. Pa. Pub. Util. Comm'n*, 706 A.2d 1197, 1201 (Pa. 1997) (*Popowsky I*)).

Petitioners' evidentiary challenges focus, essentially, on the Commission's acceptance of the opposing parties' evidence over that offered by Transource. Their arguments challenge the Commission's decision to: not accept PJM's determinations as sufficient evidence under Pennsylvania law, despite having done so in other proceedings; reject evidence that the IEC Project would resolve, and was designed to resolve, congestion beyond the APSRI; and reject evidence that the IEC Project would resolve five potential NERC reliability violations. A review of the record under the applicable appellate standard reveals that the Commission's findings are supported by substantial evidence and support the Commission's conclusion that Transource did not meet its burden of proof, which includes both the burden of production and the burden of **persuasion**, on the Siting Applications.

First, Petitioners' assertion that the Commission erred in not accepting Transource's evidence related to PJM's determination of need and the testimony of PJM employees because the Commission has done so in the past is not persuasive. Petitioners cite various Commission decisions and this Court's opinion in *Energy Conservation Council* for support because the PJM-based evidence presented in those cases was found sufficient to establish need under Pennsylvania law. However, a close reading of those Commission decisions and *Energy Conservation Council* reveals that PJM's determinations of need and related testimony and reports

37

were simply evidence offered by the applicant, which were found credible and persuasive by the Commission based on those factual records. This is apparent in this Court's decision in *Energy Conservation Council*, which references the PJM submissions as evidence that had been offered by the applicant, and accepted as persuasive by the Commission, to support a determination that the transmission lines at issue met the standards of Pennsylvania law. 995 A.2d at 470-73, 480-86. The Commission's decisions cited by Petitioners, which include the decision reviewed in *Energy Conservation Council*, likewise refer to the PJM submissions as evidence, which the Commission considered and "was persuaded by." *TrAILCo*, 2008 WL 5786507, slip op. 10-12, 16-18. *See also Susquehanna-Roseland*, 2010 WL 637064, slip op. at 9, 14, 30 (explaining that the applicant "presented extensive testimony and exhibits in order to support its [a]pplication" and describing the evidence introduced regarding PJM's process as supporting the application and meeting the applicant's burden of proof on need); *Joint Application for Approval of Merger of GPU, Inc. with FirstEnergy Corp.*, 2001 Pa. PUC LEXIS 604 (Pa. PUC May 24, 2001), slip op. at 9-10, 22-23 (accepting PJM evidence as sufficient to support the need for a merger of two electric utilities, but with a concurring opinion questioning whether such evidence was affirmative evidence that supported the relief requested). Indeed, in the *TrAILCo* case, the Commission rejected the argument of one of the opposing parties that it was "required to accept PJM's RTEP findings or that [it] must in some fashion defer to PJM on transmission siting issues," but it did "find that PJM's RTEP and the testimony surrounding the need for [proposed transmission line facilities] compelling." *Id.*, slip op. at 18 n.3 (emphasis omitted). That the Commission found evidence persuasive in some proceedings does not require it to accept it as such in all. As PJM's determinations, reports, and witnesses were offered

in the current proceedings as evidence for the Commission's consideration, that evidence is subject to challenge by opposing parties and witnesses and to weighing by the Commission. Accordingly, this is not a basis to reverse the Commission's factual findings.

Second, Petitioners argue that the Commission's findings of fact regarding PJM's cost-benefit analysis are flawed and not supported by substantial evidence. This evidence was rejected because, *inter alia*, it did not consider the negative impacts of the IEC Project on other ratepayers or that the data used to support the ongoing need for the IEC Project was outdated, ultimately, and inaccurate, and it did not include other means of resolving the alleged congestion, such as future potential generation sources. As to the first reason, OCA's evidence revealed that prior to 2014, PJM considered the negative impacts in its benefit calculation but removed this from the cost-benefit analysis in order to "increase[] the number of projects that could qualify as a market efficiency project." (OCA Cross Exhibit (Ex.) 4 at 4, 8, R.R. Vol. 7 at 6384a, 6388a.) It was not just OCA's witness who criticized PJM's cost-benefit analysis, but PJM's own Independent Market Monitor who suggested that its market efficiency process, which includes the cost-benefit analysis, be reevaluated and that the actual costs and benefits of a project should be considered and not ignored in determining whether a market efficiency project is needed. (OCA Cross Ex. 12 at 7-8, R.R. Vol. 7 at 6421a-22a; Hearing Transcript (Hr'g Tr.) at 2619-22, R.R. Vol. 3 at 2894a-97a.) Because a finding of necessity may be found under Pennsylvania law if a project results in a decrease in prices, *Hess*, 107 A.3d at 260, we do not view it an abuse of discretion for the Commission to consider evidence of **increased** consumer prices and weigh the competing cost impacts of the IEC Project to determine the necessity of that project. Further, the finding that the cost-benefit

39

analysis was based on outdated data and inaccurate predictions was supported by the credited testimony of Edward McGavran, who testified that data from 2014 was still being used to support the need for the IEC Project, despite the resolution of the congestion on the APSRI, and the reports demonstrating the significant decrease in congestion in the APSRI that was contrary to the initial predictions. (Hr'g Tr. at 8-10, R.R. Vol. 4 at 3447a-49a; OCA Statement (St.) 2 at 17 Table 3, R.R. Vol. 2 at 1079a.) Finally, the cost-benefit analysis used to support the IEC Project did not consider other ways of ameliorating congestion, such as new generation, and, in fact, was modified in 2018 to exclude from the simulation potential future generation projects that had executed a Facilities Study Agreement, which is an agreement that identifies facility additions and upgrades. (FOF ¶¶ 73-74, 76; R.D. at 89, 93-94; Transource St. AA3, Ex. TJH-AA1 at 19, R.R. Vol. 4 at 3377a; OCA Hr'g Ex. 3, R.R. Vol. 6 at 5634a-78a; Transource Response to OCA XLIII-12, R.R. Vol. 6 at 5648a; Hr'g Tr. at 2266-68, R.R. Vol. 3 at 2541a-43a; Hr'g Tr. at 2930-33, R.R. Vol. 4 at 3858a-61a.) Prior to this change, the cost-benefit ratio of the IEC Project in 2018 was 1.40, and after the change, the cost-benefit ratio in 2019 was 2.17. (FOF ¶¶ 77-78.) Ultimately, the cost-benefit analysis was evidence offered to support Petitioners' claim that the IEC Project met the standard for approval under the Code and the Regulations and, as such, it was subject to challenge by the opposing parties and weighing by the Commission. In this instance, the Commission examined the evidence presented by all the parties, weighed it, and found the opposing parties' evidence more persuasive. As this Court may not reweigh the evidence, this is not a basis for reversing.

Third, Petitioners assert that the Commission's findings rejecting congestion as a basis for the need for the IEC Project are not supported by substantial evidence.

40

The findings reflect that the IEC Project was designed to resolve congestion on the APSRI, and that congestion on the APRSI has decreased significantly since 2014, such that it no longer supports the need for the IEC Project. These findings are supported by substantial evidence, including Petitioners' own evidence. (Transource St. 2 at 7, 11, R.R. Vol. 1 at 864a; Transource St. 3 at 24-25, R.R. Vol. 1 at 905a-06a; Transource St. 8-R, Ex. TH-5R at 2, 4-5, R.R. Vol. 2 at 1738a, 1740a-41a; Transource St. No. 3-AA-RJ at 8, R.R. Vol. 4 at 3662a; Hr'g Tr. at 2132-33, 2381, 2387-88, R.R. Vol. 3 at 2662a-63a; Hr'g Tr. at 2921-23, R.R. Vol. 4 at 3849a-51a.) While Petitioners claim that the IEC Project was **also** intended to resolve congestion in the AP South Area, this evidence was not found to be persuasive because it was not asserted as a basis for the project from the beginning, was raised after the APSRI congestion had substantially resolved, little detail was provided regarding the related constraints in the AP South Area, and the evidence did not show that the congestion at the later-identified facilities was within PJM's top 25 most congested facilities. (R.D. at 83-84, 88; OCA Hr'g Ex. 6 at 559, R.R. Vol. 7 at 6263a; Transource St. AA3, Ex. TJH-AA1 at 19, R.R. Vol. 4 at 3377a; OCA Cross Ex. 7 at 2, R.R. Vol. 7 at 6505a; OCA Cross Ex. 8 at 1-2, R.R. Vol. 7 at 6408a-09a.) This reasoning does not reflect an abuse of discretion but is based on a review and a weighing of the evidence presented. Accordingly, this is not a basis for reversing.

Fourth, Petitioners maintain the Commission's findings rejecting the five potential NERC reliability violations are not supported by substantial evidence. The evidence of these potential reliability violations was found not to be persuasive because reliability violations were not the driver for the IEC Project, the potential reliability issues were not identified until 2018 – after OCA presented evidence in opposition to the congestion-based reasons, PJM did not perform its standard set of

reliability tests to confirm the need in this matter, and PJM did not rerun the reliability tests after other projects were approved to determine if those projects would resolve the potential reliability concerns. (R.D. at 83-84; Op. and Order at 61-62.) Again, these findings are supported by substantial evidence. (Transource St. 7-R at 21, R.R. Vol. 2 at 1358; Transource St. 7-RJ-SUPP at 3-4, R.R. Vol. 4 at 3108a-09a; Transource St. AA-2, Ex. SRH-AA2 at 13, R.R. Vol. 4 at 3350a; OCA St. 1-SSR at 16-17, R.R. Vol. 4 at 3077a-78a; OCA Hr'g Ex. 3, R.R. Vol. 6 at 5634a-78a; Transource Response to OCA-XLIII-10, R.R. Vol. 6 at 5647a; Hr'g Tr. at 2926-27, R.R. Vol. 4 at 3854a-55a.) While Petitioners argue that there was no need for PJM to run its standard set of reliability tests or to examine whether subsequently approved projects would resolve the potential issues once it determined that the IEC Project would do so, these arguments go to the weight to be given the evidence. Reviewing the conflicting evidence, the Commission reasonably held that "the relative weight of the evidence of . . . later-asserted bas[es] for need for the [IEC P]roject diminishe[d] as it bec[a]me[] more tangential to the unambiguous original driver[, which was the] alleviation of economic congestion on the AP[SRI]." (Op. and Order at 62.)

To summarize, Petitioners discount all the evidence presented by the opposing parties that supports the Commission's findings and attack this evidence as being overly simplistic and speculative. However, because these arguments go to the weight of the evidence presented, which is an issue for the factfinder and not this Court, and the findings of fact are supported by substantial evidence, those findings of fact are binding and cannot be set aside. *Energy Conservation Council*, 995 A.2d at 478.

42

*D. The Rescission of the Provisional CPC and Petitioners' Other Exceptions*

Petitioners assert that the Commission erred in rescinding Transource's provisional CPC because the Commission erred in concluding the IEC Project was not needed, necessary, or proper. Petitioners further argue that the Commission erred and abused its discretion in not addressing the Exceptions related to the ALJ's determination that Transource did not establish that the IEC Project met the other requirements for approval of the Siting Applications under Section 57.76(a) of the Regulations. They similarly argue that the Commission erred and abused its discretion in not addressing Transource's eminent domain applications and zoning petitions. Petitioners maintain that the Commission misinterpreted the requirements of Section 1511(a) and (c) of the Business Corporation Law of 1988 (BCL), 15 Pa.C.S. § 1511(a), (c), by omitting the "proper" from "necessary or proper" language of that section in the Opinion and Order. (Petitioners' Br. at 56-57 (quoting 15 Pa.C.S. § 1511(a), (c)).) They request that, upon this Court finding that the IEC Project meets the requirements of Section 1501 of the Code and Section 1511 of the BCL, we remand for the Commission to resolve these Exceptions.

The Commission and Intervenors respond there was no error or abuse in the Commission's rescinding Transource's provisional CPC because the CPC was granted only for the IEC Project. They further argue that the Commission did not err or abuse its discretion in not considering Transource's other Exceptions. The Commission and Intervenors contend that because the Commission's determination that the IEC Project did not meet the necessary or proper and need standards was not in error and was supported by substantial evidence, the other issues raised in the other Exceptions were moot.

In January 2018, the Commission granted Transource a provisional CPC that related only to the IEC Project and the parties to those proceedings expressly

43

reserved the issue of the determination of need for the IEC Project for future proceedings on the siting of the HV transmission lines at issue. Having concluded that the Commission did not err or abuse its discretion in determining that Transource did not meet its burden of proving that the IEC Project met the standards for approval of transmission lines under Section 1501 of the Code and Section 57.76(a)(1) of the Regulations, we discern no error or abuse of discretion in the Commission's decision to then rescind Transource's related provisional CPC. Similarly, the Commission's decision to deny the Siting Applications pursuant to Section 1501 of the Code and Section 57.76(a) of the Regulations rendered the Exceptions that addressed other alleged errors moot, and the Commission did not err or abuse its discretion in not addressing those arguments on that basis.

## III. CONCLUSION

Because we conclude that the Commission's decision denying the Siting Applications and rescinding Transource's provisional CPC was in accordance with Pennsylvania law, including Sections 1501 and 2805(a) of the Code, and Section 57.76(a) of the Regulations, and is supported by substantial, credited evidence of record, we affirm.

_____

**RENÉE COHN JUBELIRER,** President Judge

Judge Fizzano Cannon did not participate in the consideration of this matter.

44

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Transource Pennsylvania, LLC, and   :
PPL Electric Utilities Corporation,   :
                     Petitioners   :
                               :
            v.           :    No. 689 C.D. 2021
                               :
Pennsylvania Public Utility       :
Commission,                    :
                  Respondent   :

## O R D E R

**NOW**, May 5, 2022, the Order of the Pennsylvania Public Utility Commission, entered in the above-captioned matter, is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** President Judge